**Josephine O'KEEFE, Plaintiff,**

v.

**Otis BOWEN, Secretary of Health and Human Services, Defendant.**

**Louis SCHEIBELER, Plaintiff,**

v.

**Otis BOWEN, Secretary of Health and Human Services, Defendant.**

Nos. 83 CV 1600–1 (ERK), 83 CV 1600–2 (ERK).

United States District Court, E.D. New York.

Sept. 12, 1986.

Robert & Schneider by Charles Robert, Hempstead, N.Y., for plaintiffs.

Andrew Maloney, U.S. Atty., by Igou M. Allbray, Asst. U.S. Atty., Brooklyn, N.Y., for defendant.

## MEMORANDUM & ORDER

KORMAN, District Judge.

Josephine O'Keefe and Louis Scheibeler were patients admitted to the Belair Nursing Home, a post-hospital extended care facility. Mrs. O'Keefe was admitted on December 12, 1980, after being treated at Massapequa General Hospital for a broken

hip. Mr. Scheibeler was admitted on April 25, 1981, after being treated for cellulitis at Wyckoff Heights Hospital.[1] This proceeding was commenced pursuant to 42 U.S.C. § 405(g) and 1395ff(b) to obtain review of final determinations of the Secretary of Health and Human Services denying plaintiffs' claims for payment of benefits for the first hundred days of care at the Belair Nursing Home.

The benefits which plaintiffs seek are available to qualified patients for the first one hundred days of their stay at a post-hospital extended care facility, such as the Belair Nursing Home, pursuant to the "Medicare Part A" portion of the program of health insurance for the aged or disabled (42 U.S.C. § 1395 et seq.). A qualified patient is one who, *inter alia*, requires post-hospital extended care services "because the individual needs or needed on a daily basis skilled nursing care ... or other skilled rehabilitation services, which as a practical matter can only be provided in a skilled nursing facility on an inpatient basis". 42 U.S.C. § 1395f(a)(2)(B). Payment of benefits, however, is not authorized for any expenses incurred for post-hospital extended care services that are not "reasonable and necessary" for diagnosis or treatment. 42 U.S.C. § 1395y(a)(1)(A). Moreover, payment of benefits is proscribed for "custodial care" rendered at post-hospital extended care facilities. 42 U.S.C. § 1395y(a)(9); 42 C.F.R. § 405.310(g).

The Administrative Law Judges here found that Mrs. O'Keefe "did not require or receive on a daily basis skilled nursing or rehabilitation services at the Bel Air [sic] Nursing Home" (O. Tr. 12) and that Mr. Scheibeler "did not receive skilled nursing services at the Belair Nursing Home" (S. Tr. 9). Specifically, the Administrative Law Judge in Scheibeler found that the services "rendered to the beneficiary at the nursing home were custodial in nature and therefore not covered by the Medicare program" (S. Tr. 9). These determinations became the final decisions of the Secretary when the Appeals Council denied the appli-

cations which were made for further review (O. Tr. 2–3; S. Tr. 2–3).

The memoranda filed by the parties focused on the issue whether the decisions of the Secretary were supported by substantial evidence. At oral argument, however, the Assistant United States Attorney called attention to the absence in the records of a certification by a physician that either Mr. Scheibeler or Mrs. O'Keefe required skilled nursing or skilled rehabilitative care on a daily basis. Since such certifications are a prerequisite to recovery of benefits under the applicable Medicare regulations, their absence compels the affirmance of the denial of benefits, whether or not the Secretary's decisions are otherwise supported by substantial evidence.

I

Section 1395f(a)(2)(B) of Title 42 of the United States Code provides, in pertinent part, that payments for post-hospital extended care services may be made "only if ... a physician certifies (and recertifies, where such services are furnished over a period of time, in such cases, with such frequency and accompanied by such supporting material appropriate to the case involved, as may be provided by regulations ...) that ... such services are or were required to be given because the individual needs or needed *on a daily basis skilled nursing care* ... *or other skilled rehabilitation services, which as a practical matter can only be provided in a skilled nursing facility on an in-patient basis, for any of the conditions with respect to which he was receiving in patient hospital services* ... [emphasis supplied]."

The regulations promulgated by the Secretary mirror the statutory requirement. 42 C.F.R. § 405.1632. Specifically, in the case of a skilled nursing facility ("S.N.F."), 42 C.F.R. § 405.1632(f) provides that certifications and recertifications must be signed by "the physician responsible for the case or, if authorized by the responsible physician, by a physician on the staff of the

---

1. Mr. Scheibeler was also suffering from organ-
ic brain syndrome and diabetes.

facility, or the physician who is available in case of an emergency who has knowledge of the case." The regulations permit certification and recertification to be entered on or included in forms, notes, or other records a physician normally signs in caring for a patient. 42 C.F.R. § 405.1625(c). While there is no requirement that a specific procedure or specific forms be used, whatever procedure is used must permit "a verification to be made that the requirement of a physician certification" has been met. 42 C.F.R. § 405.1625(c).

An examination of the records here does not permit "a verification to be made that the requirement of a physician certification" has been met. 42 C.F.R. § 405.-1625(c). The physicians responsible for the care of Mrs. O'Keefe and Mr. Scheibeler at the hospitals in which they were patients, prior to transfer to the S.N.F., did not make the requisite initial certification. Indeed, in the case of Mrs. O'Keefe, the testimony of her son suggests that it was the opinion of the social worker, not the treating physician, that she should be placed in a skilled nursing facility (O. Tr. 26). While Mr. Scheibeler's son testified that his father's attending physician recommended a skilled nursing facility (S. Tr. 15), the "Standard Discharge Summary" at Wyckoff Heights Hospital, which was signed by Dr. E. Stevens, contains no recommendation or certification regarding a skilled nursing facility. Instead, in the space after the words "disposition and recommendations", Dr. Stevens observed only that the "patient should be taken out of bed daily, depending upon his general condition, and placed in a chair, length of time discretionary" (S. Tr. 61).

■ Moreover, the certifications made by the physician or physicians on the staff of the Belair Nursing Home, even if authorized by "the physicians responsible for the[ir] case" (42 C.F.R. § 1632(f)), likewise do not constitute certifications that either Mrs. O'Keefe or Mr. Scheibeler required "on a daily basis skilled nursing care ... or other skilled rehabilitation service ..." 42 U.S.C. § 1395f(a)(2)(B). On the form prepared upon the initial physical examination at Belair, the physician in the O'Keefe case wrote, in the space following "certification for medical care": "Pt. needs RNC & PT for rehab" (O. Tr. 64). The handwritten note in the same space by the physician in Scheibeler appears to read: "Care ADL" (S. Tr. 62). Although the writing is barely legible, this note presumably means that the patient needs care with respect to all aspects of daily living. Such a certification, like the certification that Mrs. O'Keefe needed registered or routine nursing care and physical therapy for rehabilitation, is not the equivalent of a certification that these patients needed skilled nursing care or other skilled rehabilitation service "on a daily basis" for "any of the conditions with respect to which [they were] receiving in-patient hospital services." [2] 42 U.S.C. § 1395f(a)(2)(B).

Care with respect to all aspects of daily living, without more, may constitute "personal care services" which, under the regulations, do not require the skills of qualified professional personnel and are thus not "skilled" services. 42 C.F.R. 409.33(d). Moreover, in the case of Mr. Scheibeler, there is a serious question as to whether the necessity for the prescribed care arose from "any of the conditions with respect to which he was receiving in-patient hospital services ... "42 U.S.C. § 1395f(a)(2)(B).[3] The certification of the Belair physician does not even speak to this issue.

---

2. The Director of Nursing at the Belair Nursing Home testified that, in fact, Mrs. O'Keefe was not initially receiving physical therapy on a daily basis and that she had "a poor potential" for such treatment because of her "mental status" (O. Tr. 30).

3. The Director of Nursing at the Belair Nursing Home testified that total custodial care was re-

quired by the organic brain syndrome from which Mr. Scheibeler suffered, a condition which concededly predated Mr. Scheibeler's hospitalization, and that "it's my opinion that Mr. Scheibeler would have needed a nursing home whether he had gone to the hospital [for treatment of cellulitis] or not ..." (S. Tr. 28)

## II

The only other arguably material documents in the file are the so-called DMS-1 forms. These forms, which are discussed in some detail in the opinions in *Blum v. Yaretsky*, 457 U.S. 991, 1006–1011, 1016–1027, 102 S.Ct. 2777, 2786–2789, 2792–2797, 73 L.Ed.2d 534 (1982), are not related to the administration of the Medicare Act, which provides the authorization for the benefits at issue here, *i.e.*, up to 100 days of S.N.F. care without regard to financial need. Rather, the DMS-1 forms are used by the State of New York to administer the Medicaid Act, pursuant to which the United States and New York State share equally the cost of providing post-hospital extended care services to qualified patients who are without financial means.

The Medicaid Act (like the Medicare Act) contains a number of provisions which are intended to ensure that a patient does not receive more than the appropriate level of care for his condition. Specifically, "at the time of admission, or, if later, the individual applies for medical assistance under the State plan" a physician must certify that "the services provided by the S.N.F. are or were required to be given on an inpatient basis because the individual needs or needed the service." 42 U.S.C. § 1396a(a)(44); 42 C.F.R. § 456.260. Moreover, there must be established such methods and procedures relating to the utilization of, and payment for, care and services at special nursing and intermediate care facilities, including utilization review plans, as may be necessary to safeguard against unnecessary utilization of such care and services. 42 U.S.C. § 1396a(a)(30–31). The DMS-1 forms are part and parcel of New York State's effort to comply with the various provisions of the Medicaid Act. There are at least two ways in which the DMS-1 form is normally used for this purpose.

At the time of a patient's admission, a DMS-1 form is completed by a physician for the apparent purpose of complying with the certification requirement of 42 U.S.C.

1396a(a)(44). The form provides, *inter alia,* a numerical "predictor" score which corresponds to the physician's assessment of the patient's mental and physical health. 10 N.Y.C.R.R. § 415.1(a)(1). The predictor score, which is not conclusive, is also supplemented by answers on the DMS-1 forms to questions as whether the patient requires daily supervision by a registered nurse, whether complications would arise without skilled nursing care on a daily basis, whether a program of therapy is necessary and, if so, what kind, whether the patient should be considered for different kinds of care, and whether the patient is medically qualified for the level of care he or she is receiving. "The physician brings to bear his own medical judgment in answering these questions" (*Blum v. Yaretsky, supra,* 457 U.S. at 1006, n. 15, 102 S.Ct. at 2787, n. 15) and the "physicians and not the forms, make the decision about whether the patient's care is medically necessary" (*Id.* at 1006, 102 S.Ct. at 2786).

After five days in an extended care facility, the DMS-1 form is used again. This time it is used by the S.N.F. as part of the Utilization Review Plan which New York has adopted to comply with the Medicaid Act. Pursuant to 10 N.Y.C.R.R. § 416.-9(a)(1), an S.N.F. is required to "review and make final determination for each patient within five working days of admission," using the patient assessment criteria and standards contained in the DMS-1 form and a related DMS-9 form. 10 N.Y.C.R.R. App. C-1. An S.N.F. is required to refer "those cases failing to meet the criteria standards for admission to the skilled nursing facility (a predictor score equal to or greater than 180 on the DMS-1, utilizing the DMS-9) to a physician member of the utilization review agent for review." 10 N.Y.C.R.R. § 416.9(a)(2). If the physician determines that an S.N.F. is nonetheless the appropriate placement, "the physician shall complete and sign a certification on or attached to the patient assessment indicating the reason(s) the patient requires the

level of care or services provided by the facility." (*Id.* at § 416.9(a)(2)(i)).[4]

Thus, the DMS–1 form is designed to prevent the placement of patients in facilities providing more extensive (and presumably more expensive for New York State) care than that which is actually required. However, the fact that a physician signs such certification and that the predictor score, like those in the cases of Mrs. O'Keefe and Mr. Scheibeler, exceeds 180, does not in itself constitute a certification by a physician that the patients required skilled nursing care on a daily basis within the meaning of the Medicare Act. These scores, which were compiled here by a nurse and not a physician, are arbitrary[5] and have no direct pertinence to the Medicare Act.

Moreover, presumably because of the low level of services at intermediate care facilities (called "health-related facilities") available as an alternative to S.N.F. placement in New York (*see, infra,* pp. 529–30), the scores are weighted in such a way that patients who require care in walking, eating, dressing, etc., may qualify for S.N.F. placement even though they may not require skilled nursing care on a daily basis (DMS–9, ¶ 4, 10 N.Y.C.R.R.App. C–1; O. Tr. 29, 43).[6] Indeed, despite the predictor scores indicating S.N.F. placement here, the nurses filling out the DMS–1 forms for both plaintiffs answered "no" to the questions (1) whether "the patient's condition [is] so unstable so that an R.N. must detect/evaluate the need for modifications of treatment/care on a daily basis" and (2) whether "there [is a] high probability that complications would arise in caring for the patient without skilled nursing supervision of the treatment program on a daily basis." (O. Tr. 86–91; S. Tr. 74–79). Thus, a DMS–1 predictor score, whether compiled by a nurse or a physician, is not the equivalent of the certification of a physician required by the Medicare Act.

Nor does the signature of a "U.S. Physician" following the insertion of the letters "SNF" in the space for "placement" on the bottom of the DMS–1 form constitute the requisite certification. The "U.S. Physician," according to the records, is a member of the Belair Nursing Home's Utilization Review Committee ("U.R.C."). The U.R.C. includes independent physicians and is intended to ensure economical, efficient use of medical facilities and to prevent unnecessary payments. S.R. (Finance Committee) 404, 89th Cong. 1st Sess., 1965 U.S.Code Cong. & Adm.News, p. 1943, 1987–88.[7]

Under the Medicare Act at issue here benefits for services provided by an S.N.F. may be paid only if "a finding has not been made" by a U.R.C. that such services "are not medically necessary." 42 U.S.C. § 1395f(a)(6).[8] Thus, while the signature

---

4. Section 416–9 goes on to provide procedures in the event that the physician decides that an S.N.F. placement is not the appropriate level of care.

5. *Blum v. Yaretsky, supra,* 457 U.S. at 1017, 102 S.Ct. at 2793, dissenting opinion of Justice Brennan.

6. The following colloquy between the Director of Nursing at Belair and the Administrative Law Judge in O'Keefe is instructive (O. Tr. 29):

> Witness: ... In order to get into a skilled nursing facility you have two criteria. You either have to score over 180 on a DMS–1 form which is in actuality a Medicaid Form. That is very heavily loaded on the back with custodial care. The other criteria is if the patient is so medically unstable that even though they don't score in that capacity they really couldn't function without this care around the clock.

> ALJ: Yea, that second criteria is covered by the Medicare regulations. The first is not.
> Witness: Right, that's correct.

7. Both the Medicaid and Medicare Acts require utilization review committee supervision, albeit in different ways. 42 U.S.C. § 1395f(a)(6); 42 U.S.C. § 1396a(a)(31)(B).

8. A final decision of the U.R.C. determining that a patient is receiving *greater* care than necessary is equivalent to a "Supreme Court decision". Executive Hearings on H.R. 1 Before the House Committee on Ways and Means, 89th Cong. 1st Sess. at 68 (1965); 42 U.S.C. 1395f(a)(6). This means, as Wilbur Cohen, the Under Secretary of the Department of Health, Education & Welfare testified: "If the [utilization] review board makes a mistake, there is nothing we can do about it." (*Id.* at 68.) Of course, if the U.R.C. makes a mistake in concluding that a patient

of the "U.S. Physician" following the letters "S.N.F." in the records here suggests that a U.R.C. physician concurred in the placement of Mrs. O'Keefe and Mr. Scheibeler, such approval of the placement signifies only that payment of Medicare benefits is not barred on the ground that the U.R.C. has made a finding that the services are not medically necessary. It in no way satisfies the separate requirement of a certification by a physician that either plaintiff required post-hospital extended care because of the need "on a daily basis [for] skilled nursing care". 42 U.S.C. § 1395f(a)(2)(B).

This consideration aside, there is a serious question as to the weight to be attached to the U.R.C. concurrence. The records here demonstrate that members of the U.R.C. at the Belair Nursing Home rarely examine the patients. Instead they rely solely on the information contained in the DMS–1. (O. Tr. 40, 42; S. Tr. 25). Moreover, the Director of Nursing of the Belair Nursing Home, Ernestine Olsen, testified that Mrs. O'Keefe and Mr. Scheibeler were "custodial care patients." (S. Tr. 26–29; O. Tr. 29–34). Patients like these, she stated, cannot be cared for at home because their families are unable to cope with the task of caring for them. They are old and sick. They require some medical care and total custodial care, *i.e.*, someone to "wash them, bathe them, dress them,

transfer them, feed them … etc." (S. Tr. 27). These patients, Ms. Olsen testified, should be placed in an intermediate care facility (S. Tr. 20). New York has not, however, for some reason, chosen to license or provide intermediate care facilities which are capable of providing the kind of intermediate care required by patients such as Mrs. O'Keefe and Mr. Scheibeler.[9] Thus, the only alternative for such patients is admission to either an S.N.F., which provides more care than many patients require, or a health related facility, which provides less care (S. Tr. 20). "So if you have a patient who is in between and doesn't need skilled nursing care [on a daily basis], and he needs something a little more than that health related facility … they have to go through a skilled one" (S. 25–26; O. Tr. 51–52). Faced with this practical dilemma, many physicians involved in the process, including those on the U.R.C. at issue here, have apparently determined that these custodial patients should be placed in a S.N.F. (O. Tr. 43, 44).[10]

While such determinations are both the most practical and humane, the fact remains that the statutory scheme set forth in the Medicare Act envisioned that the U.R.C. would act as a check on the attending physician's determination that a patient be admitted to an S.N.F., and not as a substitute for it.[11] Here there is no

---

requires the benefits he is receiving, the Medicare Act does not preclude the denial of benefits. Indeed, it mandates it. 42 U.S.C. § 1395y(a)(1) & (9). Opinions suggesting otherwise (*see, e.g., Gartmann v. Secretary of Health & Human Services,* 633 F.Supp. 671, 681 (E.D. N.Y., 1986)) overlook the context of the Cohen testimony and the statutory scheme.

9. The intermediate care homes which New York licenses are called health related facilities. These are defined as facilities "providing therein lodging, board and social and physical care, including but not limited to the recording of health information, dietary supervision and supervised hygienic services." 10 N.Y.C.R.R. § 414.1.(1).

10. "[T]his utilization review committee … looked at the aggregate level of need and there's *no other place to go".* …" (O. Tr. 44, emphasis supplied). This testimony of the Director of Nursing at the Belair Nursing Home is con-

firmed by statistics cited in Justice Brennan's dissenting opinion in *Blum v. Yaretsky, supra,* 457 U.S. at 1017, 102 S.Ct. at 2793. There he observed that despite the 1967 amendments to the Medicaid Act, which were intended to encourage placement of patients in intermediate care facilities, 80% of the Medicaid patients in extended care facilities in New York were in an S.N.F. In contrast, the average number of patients in an S.N.F. in a 32 state survey was 47.9% B. Vladek, *Unloving Care,* 138 (1980).

11. At the option of the S.N.F., extended stay review under the facility's Utilization Review Plan may take the place of the second and subsequent physician recertifications. 42 C.F.R. § 1632(e)(3). The facility must have available in its files a written description of its procedures for recertification which states whether review by the U.R.C. takes the place of the second and subsequent certification. 42 C.F.R. § 1632(e)(4).

certification by the physician responsible for the care of either plaintiff nor, for that matter, by a U.R.C. physician, sufficient to satisfy the standard set forth by Congress and the Secretary.

Accordingly, because the procedure Congress and the Secretary prescribed for determining eligibility for Medicare payments for the first one hundred days has not been met, the decisions of the Secretary must be affirmed. The foregoing makes it unnecessary to determine whether the grounds stated by the Secretary for denying benefits are otherwise supported by substantial evidence.[12]

12. The absence of physician certifications, the testimony of the Director of Nursing at Belair that the plaintiffs received custodial care, and the negative answers on the DMS–1 forms to questions whether the plaintiffs required daily supervision by a registered nurse and whether complications would arise without such care, lend support to the Secretary's determinations. There is, however, no need to resolve this issue.