George FRIEDMAN, Plaintiff-Appellant,

v.

SECRETARY OF the DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Defendant-Appellee.

No. 492, Docket 86–6159.

United States Court of Appeals,
Second Circuit.

Argued Nov. 10, 1986.

Decided May 18, 1987.

Charles Robert, Robert, Huber & Lerner,
Hempstead, N.Y., for plaintiff-appellant.

Robin L. Greenwald, Asst. U.S. Atty.
(Andrew J. Maloney, U.S. Atty. for E.D.
N.Y., Robert L. Begleiter, Asst. U.S. Atty.,
of counsel), for defendant-appellee.

Before KAUFMAN, WINTER, and
MAHONEY, Circuit Judges.

WINTER, Circuit Judge:

This is an appeal from Judge Korman's
decision upholding the denial by the Secre-
tary of the Department of Health and Hu-
man Services ("Secretary") of Medicare
benefits for a portion of Friedman's hospi-
tal stay during 1982. We initially issued a
summary order affirming the judgment un-
der our Rule 0.23, but have since vacated
that order at the government's request.
We again affirm, but on a different ratio-
nale.

## BACKGROUND

George Friedman was admitted to the intensive care unit of Southampton Hospital on January 28, 1982, for treatment of head injuries sustained in a fall. Friedman, then age 79, also suffered from Parkinson's disease and phlebitis. He was diagnosed on admission as having a probable skull fracture with subdural hematoma. A Dr. Flores examined Friedman and ordered administration of an EEG and a CT scan.

During Friedman's stay at the hospital, he received various medications, including Dyazide, Haldol, and Tylenol, and his vital signs were monitored. No further testing or substantial changes in his care were ordered, however, after he was transferred out of intensive care on February 20, 1982. The physicians' progress records thereafter consist primarily of notations that Friedman's "condition [is] stable" and "unchanged." After March 6, the physicians' order sheet consists almost exclusively of the notation "renew orders." The nurses' notes indicate that after Friedman's Foley catheter was removed on March 9, his treatment consisted solely of occasional back care, administration of fleet enemas, and application of a posey jacket to restrain his movements. None of these treatments was administered on a daily basis.

On March 8, 1982, the hospital's utilization review committee ("URC") notified Friedman that his care as of that date required the "daily services of skilled personnel" rather than "the service of an acute-care hospital." The notice stated that Friedman's Medicare coverage would continue "provided that efforts are being made to find an alternate skilled facility for you." Notes from the hospital's Social Services Department reflect that from March 8 to September 29, it sought to place Friedman in a skilled nursing facility ("SNF").

On April 9, 1982, the hospital notified Friedman that his stay was no longer necessary and that he was no longer covered by Medicare. The Social Services Department decertified Friedman for coverage as of that date and notified his family of the decertification. The Department's notes indicate that a bed became available at a private nursing home on April 30, but that Friedman's family rejected it. The physicians' progress records in March and thereafter contain the repeated notation that Friedman was "awaiting ECF" (extended care facility). Two DMS–1 forms, filled out by a registered nurse and dated May 13 and September 9, indicated that Friedman's care should involve "skilled nursing supervision." [1] In September, New York Blue Cross ("NYBC"), the Medicare program's fiscal intermediary, informed Friedman that no further hospital insurance benefits would be allowed for care after April 12, 1982. Friedman remained in the hospital until October 6, 1982.

Friedman initially sought reconsideration of the termination of his benefits by NYBC. In her comments on the case, NYBC reviewer Nancy Johnsen noted that Friedman received "skilled services 1–28 [to] 4–12; beg[inning] 4–13 care supportive while awaiting SNF." On October 15, 1982, NYBC formally advised Friedman that it had determined that its original denial of benefits was correct.

Friedman, through his attorney,[2] then requested a hearing before an Administrative Law Judge ("ALJ") to challenge the denial of Medicare coverage. At the April 1983 hearing, Friedman's son-in-law, William Batkin, testified on Friedman's behalf, and Dr. Meyer Texon, Associate Professor of Medicine at the New York University Medical Center and President of the New York County Medical Society, testified as a medical adviser to the ALJ. Batkin testified that he had visited his father-in-law "a few

---

1. The DMS–1 form is not related to the Medicare program but is used by hospitals in connection with New York's state-administered Medicaid program. *See Blum v. Yaretsky*, 457 U.S. 991, 1006–08, 102 S.Ct. 2777, 2786–87, 73 L.Ed.2d 534 (1982); *id.* at 1019–27 102 S.Ct. at 2793–97 (Brennan, J., dissenting) (discussing structure and purpose of DMS–1 form).

2. Because Friedman died in January 1983, further proceedings in this matter should have been brought in the name of an appropriate representative. *See* 42 U.S.C. § 1395gg(e) (1982).

times" during his nine-month hospitalization and that he had spoken twice to Friedman's doctor. Batkin could not recall the doctor's name, but testified that he would recognize it if he saw it. According to Batkin, the doctor said Friedman "belonged in a skilled nursing home and to send him back home would, literally, destroy and kill Mrs. Friedman," who was 80 years old and herself in sickly condition.

Dr. Texon had not examined Friedman personally but had reviewed his hospital records and medical history. Dr. Texon concluded that Friedman required neither acute hospital care nor skilled nursing care from April 13 to October 6, 1982. He based this conclusion on the facts that after April 12, Friedman's condition was stable, he no longer needed intravenous medication, and his treatment "consisted of just repeating orders at intervals as required." According to Dr. Texon, Friedman "needed care, but not skilled nursing care."

The ALJ denied Medicare benefits as of April 13, 1982, on the ground that Friedman did not require or receive skilled nursing care as of that date. The ALJ's ruling became the final decision of the Secretary when it was approved by the Appeals Council on October 31, 1983. The claimant then sought review of the Secretary's decision in the Eastern District of New York pursuant to 42 U.S.C. §§ 405(g) and 1395ff(b). The district judge dismissed the complaint in an oral decision from the bench.

## DISCUSSION

### A. *The Requirement of Physician's Certification*

In the district court, the Secretary argued that the denial of benefits should be upheld because Mr. Friedman had not produced a physician's certification of need for the medical services as required by 42 U.S.C. § 1395f(a)(2) (Supp. III 1985). The district judge agreed and upheld the denial of benefits principally on that ground. The Secretary repeated the argument on appeal to this court, and we originally affirmed the ruling below by an unpublished order that relied upon that contention.

The United States Attorney's Office subsequently informed us, however, that the Secretary had erred in his reading of the statute and was thus modifying his argument in this and similar cases. The Secretary now maintains that the certification requirement of 42 U.S.C. § 1395f(a)(2) relates only to *payment* for services rendered under the Medicare program, not to coverage for such services. The Secretary notes that coverage and payment are treated as two separate inquiries: first, the Secretary determines whether the individual and the services involved are covered by Medicare, and, second, if coverage exists, the Secretary determines whether the other requirements for payment to the provider have been met. Moreover, once coverage is established, the provider of services, not the patient, is responsible for obtaining the necessary physicians' certifications, 42 C.F.R. § 405.1625(b) (1986), and for bearing the risk of nonpayment if such certifications are unavailable. 42 C.F.R. § 489.21(b)(1) and 489.40(b) (1986).

■ We agree with the Secretary's interpretation of the statute. Because the claimant in the instant case disputes the Secretary's determination concerning coverage, the certification requirement is irrelevant. Accordingly, we vacated our earlier order.

### B. *Custodial Versus Skilled Care*

We now consider the coverage issues, bearing in mind that a determination by the Secretary as to an individual's entitlement to Medicare benefits is conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Ridgely v. Secretary*, 475 F.2d 1222, 1224 (4th Cir.1973); *Gartmann v. Secretary*, 633 F. Supp. 671, 679 (E.D.N.Y. 1986). We must thus uphold the Secretary's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Rodriguez v. Secretary*, 647 F.2d 218, 222 (1st Cir.1981) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

■ It is conceded that after April 12, 1982, Friedman did not receive care reimbursable under the Medicare provisions covering inpatient hospital care, 42 U.S.C. § 1395d(a)(1). Friedman contends, however, that the services received during this period are reimbursable under the provisions covering extended care services, 42 U.S.C. § 1395d(a)(2)(A), which provide for up to 100 days of post-hospital extended care services during any spell of illness. Although post-hospital extended care services ordinarily consist of those services furnished to an individual after transfer from a hospital to an SNF, *see* 42 U.S.C. § 1395x(h) and (i), a patient who needs skilled nursing care and remains in the hospital solely because no SNF bed is available may be reimbursed for that care. 42 C.F.R. § 405.1627(b). *See Monmouth Medical Center v. Harris*, 646 F.2d 74, 80 & n. 10 (3d Cir.1981). Friedman thus argues that from April 13 to October 6, 1982, he was receiving skilled nursing care and was awaiting discharge to a skilled nursing facility. The government counters that during this period Friedman did not need skilled care and that the care he received was merely custodial.[3] *See* 42 U.S.C. §§ 1395y(a)(1)(A) (no payment may be made for any expenses "not reasonable and necessary for the diagnosis or treatment of illness or injury") and (a)(9) (no payment may be made for "custodial care").

Custodial care is not defined in the Social Security Act, and the regulations merely provide illustrations of services that do not fall within the terms. 42 C.F.R. § 409.-33(d)(1986). The regulations do state that "[c]ustodial care is any care that does not meet the requirements for coverage as post hospital SNF care." 42 C.F.R. § 405.-310(g)(1986). Posthospital SNF care is defined as services that, *inter alia*, (1) are ordered by a physician, (2) require the skills of technical or professional personnel, and (3) are necessary on a daily basis. 42 C.F.R. § 409.31. *See also* 42 C.F.R.

§ 409.33 (setting forth examples of skilled nursing services).

■ A determination of a Medicare claimant's need for skilled nursing care as opposed to custodial care should be guided by two principles. First, the decision should be based upon a common sense, non-technical consideration of the patient's condition as a whole. *E.g., Gartmann*, 633 F.Supp. at 679; *Howard v. Heckler*, 618 F.Supp. 1333 (E.D.N.Y. 1985). Second, the Social Security Act is to be liberally construed in favor of beneficiaries. *E.g., Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir.1983); *See also Ridgely v. Secretary*, 345 F.Supp. 983, 993 (D. Md.1972) ("the purpose of the custodial care disqualification ... was not to disentitle old, chronically ill and basically helpless, bewildered and confused people ... from the broad remedy which Congress intended to provide for our senior citizens"), *aff'd*, 475 F.2d 1222 (4th Cir.1973). A claimant nevertheless has the burden of proving entitlement to Medicare benefits. *Morton v. Heckler*, 586 F.Supp. 110, 111 (W.D.N.Y.1984); *Rendzio v. Secretary*, 403 F.Supp. 917, 918 (E.D. Mich. 1975).

■ In rendering his decision, the ALJ stated that he had considered all of the evidence in the record, and he detailed those portions on which he relied. We conclude that substantial evidence supports his decision. The testimony of Dr. Texon provided a detailed explanation of why Friedman's overall condition and needs were such that he was not receiving and did not need skilled nursing services. This conclusion is consistent with the statements in the nurses' notes, the physicians' progress records and order sheets, and the URC reports. Thus, "[t]his is not a case in which the ALJ and reviewing physician reached a decision contrary to the uncontroverted medical testimony, or unsupported by other adequate acceptable evi-

---

**3.** The government also asserts that benefits were properly denied because Friedman failed to meet the "bed is not available" requirement of 42 C.F.R. § 405.1627(b), due to his refusal to accept placement in a private nursing home in April 1982. Because we affirm on the ground that Friedman received only custodial care, we do not address this issue.

dence." *Warncke v. Harris,* 619 F.2d 412, 416 (5th Cir.1980).

The strongest evidence supporting Friedman's position is contained in the two DMS–1 forms, which conclude that he needed "SNF" care.[4] The details in these forms do not necessarily support this conclusion. For example, thirteen categories of "nursing care and therapy," including "other," are listed. Each is checked "none." Moreover the forms state that the patient's condition was not "unstable so that an R.N. must detect/evaluate need for modifications of treatment/care on a daily basis." Statements that the patient was "awaiting ECF" in the physicians' progress records establish only that Friedman was awaiting transfer to an extended care facility and have no bearing on what type of care Friedman received during the pertinent time.

The claimant's other evidence was wholly conclusory except for Batkin's testimony that Friedman's doctor said Friedman "belonged in a skilled nursing home and to send him back home would, literally, destroy and kill Mrs. Friedman." Even if we assume that the treating physician rule developed in Social Security disability cases, *see Havas v. Bowen,* 804 F.2d 783, 785–87 (2d Cir.1986); *Schisler v. Heckler,* 787 F.2d 76, 81–85 (2d Cir.1986), applies in Medicare reimbursement cases, *compare Gartmann,* 633 F. Supp. at 680 (stating that treating physician rule "may well apply with even greater force in the context of Medicare reimbursement") *with Rendzio,* 403 F. Supp. at 919 (noting that "persuasive authority" advises against extending treating physician rule to Medicare de-

terminations), there is insufficient evidence in the instant case to put that rule in issue. First, the quoted statement is ambiguous as to whether it weighs skilled nursing services against professional custodial care or merely against home care. Second, the treating physician rule does not come into play absent a more detailed identification of the physician to whom the conclusion is attributed and a description of his or her role as a treating physician. The record reflects that Friedman was a "regular patient" of one Dr. Maron. It also reflects that two other doctors examined Friedman for various reasons and at various times while he was in the hospital. Because Batkin testified that he would remember the doctor's name if he saw it, we may presume that it was not that of any of the doctors, including Dr. Maron, mentioned in the exhibits, all of which were available at the hearing and had been examined by Batkin's attorney. Batkin's testimony therefore is insufficient to put the treating physician rule in issue.

The decision of the district court upholding the Secretary's denial of benefits is affirmed.

---

4. The claimant also maintains that the predictor scores of 326 points on the two DMS–1 forms support the argument for Medicare coverage. Under New York regulations, a predictor score of 180 or more signifies a Medicaid patient's need for a skilled nursing facility, *see* 10 N.Y.C. R.R. § 415(a)(2), rather than an intermediate care facility, called "health-related facilities," *see* 10 N.Y.C.R.R. § 420.1(a). *See Blum v. Yaretsky,* 457 U.S. at 994, 102 S.Ct. at 2780; *id.* at 1021, 102 S.Ct. at 2794 (Brennan J., dissenting). Yet these scores are not directly pertinent to the Medicare program, much less conclusive. As the Supreme Court acknowledged in *Blum v. Yaretsky,* "the physicians, and not the forms, make the decision about whether the patient's care is medically necessary." 457 U.S. at 1006, 102 S.Ct. at 2787. Moreover, because intermediate care facilities often provide a low level of services, the scores are weighted in such a way that patients who require aid in activities such as walking, eating, or dressing may qualify for SNF placement even though they may not require skilled nursing care on a daily basis. *See O'Keefe v. Bowen,* 643 F.Supp. 523 (E.D.N.Y. 1986).