**Diane MARTINELLI, Plaintiff,**

**v.**

---

Sylvia M. BURWELL,[1] Secretary of the Department of Health and Human Services, Defendant.

No. 1:13–CV–00868 EAW.

United States District Court, W.D. New York.

Signed Sept. 16, 2015.

Filed Sept. 18, 2015.

---

1. Sylvia M. Burwell became the Secretary of Health and Human Services on June 9, 2014. As such, the Court hereby amends the caption of the case *sua sponte* to reflect that Ms. Burwell is the Defendant.

Anthony Szczygiel, Legal Services for the Elderly, William W. Berry, Legal Services for the Elderly/Disabled/Disadvantaged of WNY, Buffalo, NY, for Plaintiff.

Mary K. Roach, U.S. Attorney's Office, Buffalo, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

## I. INTRODUCTION

Plaintiff Diane Martinelli ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1395ff(b), seeking review of the final decision of the Secretary of the Department of Health and Human Services ("the Secretary") denying Plaintiffs application for Medicare coverage for services and treatment for a 15–day period beginning on April 23, 2011, and continuing up to May 8, 2011. (Dkt. 1). Plaintiff alleges that the final decision of the Secretary, issued by the Medicare Appeals Council ("MAC"), was not supported by substantial evidence in the record and was based on erroneous legal standards. (Dkt. 14 at 3).

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 13, 15). For the reasons set forth below, this Court finds that the decision of the Secretary is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Thus, the Secretary's motion for judgment on the pleadings (Dkt. 15) is granted, and Plaintiff's motion (Dkt. 13) is denied. Plaintiff's complaint is dismissed with prejudice.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Admission and Therapy Records

On March 2, 2011, Plaintiff, a 65–year old female, was admitted to Kenmore Mercy Hospital due to pain in her surgically repaired right femur. (Administrative Transcript ("Tr.") 167). X-rays revealed a recurrent fracture at her right femur and through a surgically inserted metal plate. (Id.). After reviewing Plaintiff's medical history of hypertension, Type II insulin-dependent diabetes, and recent gastrointestinal bleeding, Kenmore Mercy Hospital transferred Plaintiff to the trauma center at ECMC on March 3, 2011. (Id.).

Plaintiff underwent surgery on March 5, 2011, to repair her fractured leg. (Tr. 141). On March 12, 2011, Plaintiff was transferred to ECMC's subacute rehabilitation unit, a skilled nursing facility ("SNF"), with a treatment goal to "continue occupational therapy and physical therapy for strength and endurance, and for discharge home." (Tr. 142).

Plaintiff started physical therapy ("PT") and occupational therapy ("OT") on March 14, 2011. (Tr. 213–14, 216–19). Plaintiff made gains in therapy but was limited by her weight-bearing status and anxiety related to therapy and fear of having to go through another surgery. (Tr. 293).

Plaintiff's anxiety, combined with her complex medical condition, called for a comprehensive plan of care by Dr. Stephan Evans. (Tr. 142–43). This plan of care included: continued OT and PT; monitoring incision sight for signs and symptoms of infection; monitoring of uncontrolled diabetes; monitoring of peptic ulcer disease for signs and symptoms of bleeding; monitoring hypertension and adding medication as needed; monitoring and application of medication to a fungal rash on Plaintiffs abdomen; and monitoring of her lab studies. (Id.). The SNF notes indicate that other than continued OT and PT, these orders by Dr. Evans were followed throughout her stay, including the non-covered period in question for this case. (Tr. 26–33).

Plaintiff was discharged from PT on April 8, 2011, and her discharge report indicated that Plaintiff's weight-bearing status was "toe-touch weight-bearing." (Tr. 220–21). The report stated that Plaintiff would be reevaluated for PT once

her weight-bearing status upgraded to "weight-bearing as tolerated." (*Id.*). Plaintiff was also provided with a home exercise program ("HEP"). (*Id.*). Plaintiff was discharged from OT on April 22, 2011. (Tr. 223).

### B. Procedural History

On April 20, 2011, Plaintiff received a "Notice of Medicare Provider Non-Coverage" from ECMC, indicating that Medicare coverage for SNF services would end on April 22, 2011. (Tr. 137). The heading of the notice stated, in capital letters: "THE EFFECTIVE DATE COVERAGE OF YOUR CURRENT SKILLED NURSING SERVICES WILL END: 4/22/2011." (*Id.*). The notice stated that the reason for noncoverage was that Plaintiff's PT had been discontinued on April 6, 2011, and that her OT would be discontinued on April 22, 2011. (Tr. 137–39). The notice also indicated: "[y]ou may have to pay for any skilled nursing services you receive after the above date." (*Id.*).

Plaintiff requested an appeal of this determination with the Quality Improvement Organization ("QIO"), an independent Medicare reviewer. (Tr. 134). QIO affirmed that coverage for SNF would end effective April 22, 2011, because PT and OT were discontinued as a result of Plaintiff's weight bearing status. (*Id.*).

Plaintiff requested expedited reconsideration of this determination, and on April 26, 2011, the Qualified Independent Contractor ("QIC") issued a decision upholding the denial of coverage. (Tr. 116–28).

Plaintiff timely filed a request for a hearing by an ALJ, and on May 1, 2012, Plaintiff appeared, without legal representation, for a telephone hearing before ALJ Bole. (Tr. 226). On May 23, 2012, ALJ Bole issued a decision finding that the services at issue were excluded from Medicare coverage. (Dkt. 1–2; Tr. 82–92). The ALJ determined that the care Plain-

tiff received after April 22, 2011, was custodial and not covered by Medicare. (Tr. 78).

On July 8, 2013, the Medicare Appeals Council ("MAC") modified the decision of the ALJ but continued to deny coverage for the services. (Dkt. 1–1; Tr. 3–8). The MAC first clarified that the issue before it was "whether the termination of Medicare coverage for the services provided by the SNF, effective April 22, 2011, was appropriate." (Dkt. 1–1 at 3). The MAC then acknowledged that Plaintiff had submitted nursing notes dated April 23, 2011 through May 8, 2011, in an effort to show that Plaintiff required skilled nursing care, but found that these notes were not relevant to the issue on appeal because they postdated the termination of skilled services on April 22, 2011. (Tr. 7). Nonetheless, the MAC stated that even if the nursing notes were considered, they showed that Plaintiff received only custodial care during the time period at issue. (*Id.*). The decision of the MAC is the final decision of the Secretary. On August 27, 2013, Plaintiff commenced this civil action. (Dkt. 1).

### C. Plaintiff's Testimony

At the May 1, 2012 hearing, Plaintiff testified that after her March 5, 2011 surgery she was unable to perform any therapy because she was afraid that she would reinjure her leg, and the thought of going through another operation caused her to suffer panic and asthma attacks. (Tr. 276–78). Plaintiff further stated that she did not receive any PT or OT during the period from April 23, 2011 to May 8, 2011, but she did stay at the SNF. (Tr. 283–84). While she did not receive PT or OT during this time period, Plaintiff testified that she did receive other services. Plaintiff testified that she was able to self-propel a wheelchair in the hallways, bathe herself, and perform HEP exercises, but needed

help transferring in and out of bed and did use a bedpan. (Tr. 284–85). Plaintiff also stated that she was receiving daily Heparin injections in her stomach during this period to avoid blood clots. (Tr. 286).

The orthopedist put Plaintiff back on weight bearing status on May 8, 2011, and Plaintiff resumed therapy. (Tr. 280, 282). After therapy resumed, Plaintiff experienced an irregular heartbeat and was re-admitted to the hospital for treatment of atrial fibrillation from May 25, 2011 through May 31, 2011. (Tr. 278, 283). Plaintiff testified that she was transferred back to the same sub-acute rehabilitation floor of the hospital where she resumed SNF services on May 31, 2011. (*Id.*). Plaintiff was discharged from the hospital on June 16, 2011. (Tr. 287–88).

## III. DISCUSSION

### A. Standard of Review

■ "The standard of review of the Secretary's determination is set forth in 42 U.S.C. § 405(g), which applies to agency determination under the Medicare program by operation of 42 U.S.C. § 1395ff(b)(1)(A)." *Murray v. Sec'y of Health & Human Servs.*, No. 08–CV–1143 (GLS/VEB), 2009 WL 6654512, at *3 (N.D.N.Y. Nov. 23, 2009), *adopted by* 2010 WL 2771889 (N.D.N.Y. Jul. 12, 2010). "A final decision by the Secretary of Health and Human Services as to Medicare coverage is conclusive if it is supported by substantial evidence." *Rapport v. Leavitt*, 564 F.Supp.2d 186, 191 (W.D.N.Y.2008). Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

■ The Court should uphold the Secretary's findings " 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to

support his conclusion.' " *Friedman v. Sec'y of Dep't of Health & Human Servs.*, 819 F.2d 42, 44 (2d Cir.1987) (quoting *Rodriguez v. Sec'y*, 647 F.2d 218, 222 (1st Cir.1981)). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir.1990).

■ "A district court's review of the Secretary's determination is limited to 'whether the [Secretary] applied the proper legal standards, whether its factual findings were supported by substantial evidence, and whether [the Secretary] provided a full and fair hearing.' " *Glick v. Johnson*, No. 09–CV–0666 (CBA), 2011 WL 6140523, at *4 (E.D.N.Y. Dec. 9, 2011) (quoting *Kaplan v. Leavitt*, 503 F.Supp.2d 718, 722 (S.D.N.Y.2007)). "[T]he claimant bears the burden of proving her entitlement to Medicare coverage." *Keefe v. Shalala*, 71 F.3d 1060, 1062 (2d Cir.1995).

■ Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988).

### B. Determining Medicare Eligibility for Post–Hospital Skilled Nursing Facility Care

■ Medicare is "the federal government's health insurance plan for the elderly and certain persons with disabilities." *Matthews v. Leavitt*, 452 F.3d 145, 146 n. 1 (2d Cir.2006). Part A of the Medicare Act "provides for payment of insurance benefits for acute care given in a hospital and extended care services given in a skilled nursing facility." *Chamberlain v. Leavitt*, No. 06–CV–0646 (NAM/RFT), 2009 WL 385401, at *5 (N.D.N.Y. Feb. 10, 2009); 42 U.S.C. §§ 1395c–1395i–5. This case in-

788

volves Part A payments for post-hospital skilled nursing facility care.

Under the Code of Federal Regulations, "[t]o be considered a skilled service, the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a). In addition:

> A condition that does not ordinarily require skilled services may require them because of special medical complications. Under those circumstances, a service that is usually nonskilled ... may be considered skilled because it must be performed or supervised by skilled nursing or rehabilitation personnel.... In situations of this type, the complications, and the skilled services they require, must be documented by physicians' orders and nursing or therapy notes.

42 C.F.R. § 409.32(b).

By contrast, "Medicare does not cover care that is considered to be merely custodial." *Chamberlain*, 2009 WL 385401, at *5; 42 C.F.R. § 411.15(g) (excluding "custodial care" from coverage, describing such care as "any care that does not meet the requirements for coverage as SNF care...."). "Custodial care is not defined in the Social Security Act, and the regulations merely provide illustrations of services that do not fall within the terms." *Friedman*, 819 F.2d at 45 (citing 42 C.F.R. § 409.33(d)). "Although not specifically defined in the Act, custodial care has been interpreted to mean care that is routine in nature and which can be provided by a nonprofessional or lay person without special skills, and which does not require supervision by trained or skilled personnel." *Chamberlain*, 2009 WL 385401, at *6. "Personal care services that do not require the skills of qualified technical or professional personnel are not skilled services and therefore are not covered by Medicare." *Estate of Frohnhoefer v. Leavitt*,

No. 06–CV–1236 SJF, 2007 WL 841917, at *2 (E.D.N.Y. Mar. 19, 2007). "Such personal care services include administration of oral medication; bathing and treatment of minor skin problems; assistance in dressing, eating and going to the toilet; and general supervision of previously taught exercises and assistance with walking." *Id.*

"[O]verall management and evaluation of a care plan involving personal care services may constitute skilled services when, in light of the patient's condition, the aggregate of these services require the involvement of technical or professional personnel." *Id.* (citing 42 C.F.R. § 411.33(a)(1)(i)). "In addition, observations and assessment by a technical or professional person may constitute skilled service when such skills are required to identify the patient's need for modification of treatment or for additional procedures until his or her condition is stabilized." *Id.* (citing 42 C.F.R. § 409.33(a)(2)).

"A determination of a Medicare claimant's need for skilled nursing care as opposed to custodial care should be guided by two principles. First, the decision should be based upon a common sense, non-technical consideration of the patient's condition as a whole. Second, the ... Act is to be liberally construed in favor of beneficiaries." *Friedman*, 819 F.2d at 45.

### C. Plaintiff's Contentions

Plaintiff contends that there is substantial evidence in the record that she received skilled nursing services from April 22, 2011 through May 8, 2011, qualifying her for Medicare coverage at that time. (Dkt. 14 at 3). Plaintiff also contends that the MAC committed legal errors by: (1) changing the issue on appeal; and (2) excluding relevant evidence to decide the

newly defined issue based on an incomplete record. (*Id.* at 4).

## 1. Custodial Care vs. Skilled Nursing Care

The MAC determined that "the record does not show that [Plaintiff] required or received skilled care as of April 22, 2011." (Tr. 5). Further, the MAC found that "[a]t most, [Plaintiff] received custodial care, such as general monitoring of vital signs, administration of medication, and assisting with transfers." (*Id.*).

The Secretary notes that, pursuant to 42 C.F.R. § 409.31(b)(2), skilled services must be needed for a condition for which the beneficiary received inpatient hospital services, or that arose while the beneficiary was receiving care in a SNF for which he or she received inpatient hospital services. (Dkt. 16 at 7). Here, Plaintiff was treated inpatient for a fracture in her right leg, was not hospitalized for her preexisting conditions, and none of these preexisting conditions "arose" while Plaintiff was inpatient for treatment of her right leg.

Plaintiff contends that there is substantial evidence that she received skilled nursing services from April 22, 2011 through May 8, 2011, that qualify her for Medicare coverage. (Dkt. 14 at 3). Specifically, Plaintiff argues that the following services she received met the requirements for skilled nursing: (1) Heparin subcutaneous injections every eight hours; (2) management and evaluation of a care plan; and (3) observation and assessment of a patient's changing condition. (*Id.* at 7–8).

### a. Heparin Injections

Initially, Plaintiff contends that "[t]he daily injections by Nurses of a physician prescribed medication, by itself, establish[es] the need for and receipt of skilled nursing services." (Dkt. 14 at 14). However, subcutaneous injections alone do not constitute skilled nursing services.

An earlier version of the applicable regulations did specifically include "[i]ntravenous, intramuscular, or subcutaneous injections" as "[s]ervices that qualify as skilled nursing services." 42 C.F.R. § 409.33(d)(1) (1987); *see Hurley v. Bowen,* 857 F.2d 907, 911 (2d Cir.1988). By contrast, the current version of the regulations only states that "[i]ntravenous or intramuscular injections and intravenous feeding" constitute services that qualify as skilled nursing services, with no mention of subcutaneous injections. *See* 42 C.F.R. § 409.33(b)(1). In formulating this new version of the regulations, the Health Care Financing Administration explained "[w]e ... believe that the ordering of subcutaneous injections can no longer be considered sufficient in itself to justify the designation of a covered SNF level of care.... Further, with the evolving state of clinical practice over time, the administration of a subcutaneous injection has now become commonly accepted as a nonskilled service even in less intensive settings...." 63 Fed.Reg. 26252, 26284 (May 12, 1998).

In accordance with this language, Plaintiff's argument that her physician-ordered Heparin subcutaneous injections alone qualified her for skilled nursing services is misplaced and is not a basis for remand.

### b. Management and Evaluation of a Care Plan

The Code of Federal Regulation states in relevant part as follows:

The development, management, and evaluation of a patient care plan based on the physician's orders constitute skilled services when, because of the patient's physical or mental condition, those activities require the involvement of technical or professional personnel in order to meet the patient's needs, promote recovery, and ensure medical safety. Those activities include the management of a plan involving a variety of personal care services only when, in

light of the patient's condition, the aggregate of those services requires the involvement of technical or professional personnel.

42 C.F.R. § 409.33(a)(1)(i).

[18] Plaintiff argues that her combination of impairments and the treatment she received daily, including the Heparin injections, required the management and evaluation of a care plan and qualified her for Medicare-covered skilled nursing services. (Dkt. 14 at 14). The Secretary argues that skilled services were not needed for the overall management and evaluation of Plaintiffs care plan as of April 22, 2011, because Plaintiff's condition was stable, she exhibited no signs of infection, her foley tube and surgical staples had been removed, her femur had healed, and there was no evidence of a likely potential for serious complications. (Dkt. 16 at 9).

 "If the patient's age and the nature of her condition create a high potential for serious complications, only a skilled professional would have the ability to understand the relationship and effect of the various services provided." *Smith o/b/o McDonald v. Shalala*, 855 F.Supp. 658, 663 (D.Vt.1994) (citing 42 C.F.R. § 409.33(a)(1)). On the other hand, "the fact that the [Plaintiff] was monitored and notes were taken about her condition does not mean that she was receiving skilled nursing services. At a nursing home, nurses must evaluate and record observations about a resident whether or not that resident meets the Medicare guidelines.... These observations did not constitute skilled services since such observations were not required in order to stabilize the [Plaintiff] or modify her treatment." *Frohnhoefer*, 2007 WL 841917, at *6.

There is substantial evidence in the record to support the MAC'S determination that Plaintiff's care plan as of April 22, 2011, did not qualify as skilled nursing

services. Nurses monitored Plaintiffs condition and administered medications and assisted in transfers, but these are not considered skilled nurse services. *See* 42 C.F.R. § 409.33 (setting forth examples of skilled nursing services). Plaintiff contends that her preexisting conditions in combination with her leg surgery placed her in a position that she was a complex case and required skilled nursing services to monitor her condition. (Dkt. 17 at 5). While this may have been the case when Plaintiff was first admitted to the hospital, the medical records show that Plaintiff was stabilized for weeks before the decision to terminate coverage was made. Nursing notes from March 12, 2011 through April 22, 2011, show that Plaintiff was oriented in time, place, and person, had a good appetite, was sleeping well, had no signs or symptoms of hyperglycemia, and had no complications from her surgery. (Tr. 186–212, 194–95, 202, 207, 209). The record also shows that Plaintiff was independent prior to her admission to the hospital and did not receive any home services for the same conditions she experienced during the period of non-coverage. (Tr. 183). As a result, it was reasonable for the Secretary to conclude that even the combination of impairments Plaintiff experienced as of April 22, 2011, did not require skilled nursing services.

**c. Observation and Assessment of a Patient's Changing Condition**

The Code of Federal Regulations states in relevant part as follows:

Observation and assessment constitute skilled services when the skills of a technical or professional person are required to identify and evaluate the patient's need for modification of treatment or for additional medical procedures until his or her condition is stabilized.

42 C.F.R. § 409.33(a)(2)(i).

 The Secretary contends that, as of April 22, 2011, Plaintiff was "indisputably

in a stable condition" and was not in the "complicated, unstabilized postoperative period" where "close monitoring for postoperative complications and adverse reactions" contemplated by 42 C.F.R. § 409.33(a)(2)(ii) is required. (Dkt. 15–1 at 23). *Cf. Howard v. Heckler*, 618 F.Supp. 1333, 1335 (E.D.N.Y.1985) (extent and severity of claimant's symptoms including cancer, thyroid, and hip injury complications required skilled nursing services to monitor and adjust medications). The records indicate that Plaintiff's condition was unchanging by April 22, 2011, and her treatment did not require the supervision of skilled nursing staff to monitor or change her treatment regimen or medications. (Tr. 186–212, 194–95, 202, 207, 209).

Because Plaintiffs condition had stabilized as of April 22, 2011, there is substantial evidence to support the MAC'S finding that she did not require observation and assessment of a changing condition.

### 2. Changing the Issue on Appeal and Excluding Relevant Evidence

In rendering its decision, the MAC noted: "[t]he Council first clarifies that the issue in this case is whether the termination of Medicare coverage for the services provided by the SNF, effective April 22, 2011, was appropriate." (Dkt. 1–1 at 3).

Plaintiff argues that the MAC improperly changed the issue on appeal, focusing only on April 22, 2011, when Medicare coverage was still in place, instead of the two week period that followed. (Dkt. 14 at 4). Plaintiff also argues that the MAC erred by not discussing the records submitted with her MAC appeal document showing that she was receiving "daily physician-prescribed injections" or the care plan set by Dr. Evans. (Dkt. 14 at 15–16). Plaintiff contends that by excluding this relevant evidence, "the MAC did not explain why these skilled nursing services

would not result in Medicare coverage" and committed legal error. (*Id.* at 16).

The Secretary counters that it was appropriate for the MAC to limit its focus to the termination of services effective April 22, 2011, because a retrospective review of Plaintiff's condition after the decision to terminate services would be improper, and that in any event, the MAC did consider the services provided to Plaintiff from April 23, 2011 to May 8, 2011, and found that the records merely showed a "continued trend showing the beneficiary received only custodial care during her time at the SNF." (Dkt. 15–1 at 13–14 (quoting Tr. 19)).

Because Plaintiff was appealing the determination of the Secretary terminating her coverage on April 22, 2011, it was appropriate for the MAC to limit its review to Plaintiff's condition and services at the time the determination to terminate coverage was made. Otherwise, the MAC would be improperly basing its determination on records that were not in front of the provider at the time the determination to stop coverage was made. *See Smith*, 855 F.Supp. at 663 ("The only basis for the ALJ's rejection of Dr. Warner's opinion is the ALJ's ex post facto interpretation of McDonald's vital signs. This is an error of law."). "[S]ervices must ... be viewed from the perspective of the condition of the patient when the services were ordered and what was, at the time, reasonably expected to be appropriate treatment for the illness or injury through the certification period." Home Health Agency Manual § 205.1(A)(4).

Even if the MAC was required to retroactively consider the treatment Plaintiff received during the period of non-coverage from April 22 through May 8, 2011, the analysis would not have changed the outcome of the appeal.

Plaintiff is arguing that she received skilled services through: (1) Heparin subcutaneous injections every eight hours; (2) management and evaluation of a care plan; and (3) observation and assessment of a patient's changing condition. (Dkt. 14 at 7–8). The record shows, and Plaintiff testified, that Plaintiff was receiving those same services on April 22, 2011. Therefore, the real question is whether those services, in totality, constitute skilled nursing services as defined by the Act. Whether the MAC considered those services on April 22, 2011, or for the two week period of non-coverage, the services were the same, and the MAC determined that absent PT or OT, Plaintiff was not receiving skilled services as of April 22, 2011. Accordingly, the MAC did not commit a legal error in clarifying the question on appeal.

Moreover, although the MAC did not explicitly reference the fact that Plaintiff received Heparin shots or that Dr. Evans had a treatment plan in place, that does not suggest that the MAC did not consider this treatment. Indeed, the MAC notes at the outset of its decision that it has "considered the record and the appellant's contentions." (Tr. 3). The MAC examined the medical records and determined Plaintiff received only custodial care through the monitoring of vital signs, administration of medication, and assisting with transfers in the period leading up to the April 22, 2011 termination of coverage. (Tr. 7). The records before the ALJ and the MAC on appeal included Dr. Evans' treatment plan and order to administer Heparin injections. (Tr. 141–43, 151). Further, as the Secretary notes, the MAC did evaluate the additional medical records supplied by Plaintiff at the appeal and determined that these services did not qualify as skilled nursing services. Because it appears that there is substantial evidence to support the Secretary's denial of coverage and that the MAC reviewed all of the evidence, even the supplemental records Plaintiff provided on appeal, Plaintiff's arguments that the MAC failed to consider relevant evidence are rejected.

## IV. CONCLUSION

The Secretary's findings are supported by substantial evidence in the record and are proper as a matter of law. Accordingly, Plaintiff's motion for judgment on the pleadings (Dkt. 13) is denied, and the Secretary's cross-motion for judgment on the pleadings (Dkt. 15) is granted. Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.