**William J. HURLEY, Deceased, by his spouse Helen HURLEY, Plaintiff–Appellant,**

v.

**Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant–Appellee.**

**No. 917, Docket 88–6007.**

United States Court of Appeals, Second Circuit.

Argued April 4, 1988.

Decided Sept. 26, 1988.

Charles Robert, Hempstead, N.Y. (Robert, Hubert & Lerner, Hempstead, N.Y., of counsel), for plaintiff-appellant.

Barbara H. Fisher, Dept. of Health and Human Services, Baltimore, Md. (Ronald E. Robertson, Gen. Counsel, Terry Coleman, Chief Counsel, Thomas K. Stuber, Dept. of Health and Human Services, Baltimore, Md.; Andrew J. Maloney, U.S. Atty. for E.D.N.Y., Brooklyn, N.Y., Robert L. Begleiter, Chief, Civil Div., E.D.N.Y., Brooklyn, N.Y., of counsel), for defendant-appellee.

Before OAKES and WINTER, Circuit Judges, and CEDARBAUM, District Judge.*

WINTER, Circuit Judge:

This appeal concerns a denial by the Secretary of Health and Human Services ("Secretary") of Medicare benefits on the ground that the claimant did not receive skilled nursing care during a portion of a hospital stay. Because the claimant did receive skilled nursing care for part of the period for which benefits were denied, we affirm in part and reverse in part.

## BACKGROUND

On September 4, 1981, William Hurley, who was seventy-one years old, was admitted to the Community Hospital at Glen Cove, New York and diagnosed by his treating physician, Dr. Robert Goodman, as having suffered a stroke. The admitting report states that he had suffered a sudden loss of consciousness and had fallen and struck the back of his head. During his hospital stay, Hurley was frequently agitated and confused. He was treated with sedatives and psychotropic drugs, including Librium, Thorazine, Vistaril and Haldol. Tests were run, including a CAT (computerized axial tomography) scan on September 10, 1981 which revealed moderate generalized cerebral atrophy. Possible alcohol-

* The Honorable Miriam Goldman Cedarbaum, United States District Judge for the Southern District of New York, sitting by designation.

ism was also diagnosed. Apparently he suffered another fall on the night of September 13, 1981 but there was no evidence of head trauma.

In mid-September, his condition vacillated between alertness and confusion. Toward the end of the month, however, he was improved and more cooperative. On October 1, 1981, the Hospital Utilization Review Committee ("URC"), of which Dr. Goodman was Chairman, notified Hurley that he no longer needed acute care services in a hospital and that as of October 2, 1981, he would accordingly no longer be entitled to acute care hospital benefits under Medicare or Medicaid. The Social Work Department in the hospital began seeking an alternative placement for Hurley, and records indicate that by October 1, 1981, the Department had contacted twelve nursing homes without apparent success. Hurley, who had decided to appeal the URC's decision, remained in the hospital.

Hurley suffered a temporary relapse during the first eleven days of October. Early on the morning of October 1, 1981, Hurley was found walking in the halls, trying to leave the hospital. He was agitated and confused and refused to return to his room. Fifty milligrams of Thorazine was administered to Hurley at approximately 4:00 a.m. At 2:00 a.m. on October 2, Hurley was found wandering in another patient's room and cursing the nurses. He was returned to his bed and given an intramuscular injection of 25 milligrams of Vistaril. At 2:30 p.m. that same day, he was found on the wrong floor of the hospital and was restrained in a chair. At 4:00 a.m. on October 3, he was found to have locked himself in a bathroom with a pair of scissors. The scissors were taken away and he was put back to bed. At 12:30 p.m. he was again found wandering and was restrained in a chair. At dinner he repeatedly asked for alcoholic drinks and became agitated when told none were available. He tried to use the phone to call the police and was placed in restraint. After the restraint was removed at 8:30 p.m., Hurley was found by a guard in the hall looking for a pay phone. He was returned to bed.

At 12:30 a.m. on October 4, 1981, Hurley was found agitated and given an intramuscular injection of 1 milligram of Haldol and restrained. At 10:00 a.m. he received his morning care while in a chair restraint. At 10:00 p.m. he was awake in bed with a safety jacket on. At 1:30 a.m. on October 5, Hurley was found trying to get off the floor. He was given an intramuscular injection of 1 milligram of Haldol.

On October 6, 1981 Dr. Goodman saw Hurley. The two discussed where Hurley would go after discharge, either to a nursing home or home to his wife. On October 9 at midnight, Hurley was agitated and trying to get out of bed. He was restrained in a safety jacket and given an intramuscular injection of 2.5 milligrams of Haldol. At 6:00 a.m., he was awake and confused, asking for scissors to cut the safety jacket off. At 1:30 p.m. and again at 7:30 p.m. he was found wandering on a different floor. At 8:30 p.m. he was in bed with the safety jacket on. At 10:00 a.m. on October 10, 1981 Hurley was placed in a chair restraint. A chair restraint was also used at 2:30 p.m. on October 11.

While Hurley was observed as confused on several occasions between October 11, 1981 and his discharge on October 23, neither restraints nor medication were needed during this period. The record indicates that by October 20, Hurley had improved considerably, to the point that nursing home care would be unnecessary and that Hurley could be sent home.

On November 13, 1981, Hurley's appeal from the URC determination was denied by the Nassau Physician's Review Organization on the ground that there "[was] no documentation in the medical record to support the need for acute care services under Medicare guidelines." Hurley appealed this decision to the Secretary pursuant to Section 473 of the Health Care Financing Administrative Regulations, 42 C.F.R. § 473 (1987). At a de novo hearing before an Administrative Law Judge ("ALJ") held on September 15, 1982, Hurley's counsel conceded that Hurley did not need acute care after October 1, 1981. However, he also argued that Hurley was entitled to

Medicare benefits after this date because he required skilled nursing care and remained in the hospital only because no bed in a skilled nursing home was available. Hurley's wife testified that Dr. Goodman had advised her of the necessity of such care. A letter from Dr. Goodman dated April 6, 1982 stating that "[d]uring this time [Hurley] was awaiting placement in a skilled nursing facility as it was felt he had a permanent organic brain syndrome which would require continued skilled nursing care" was also submitted.[1]

On October 26, 1982, the ALJ affirmed the denial of benefits on the grounds that the evidence indicated that Hurley needed only custodial care during the period between October 2 and October 23, 1981 and that there was no evidence in the record that a skilled nursing home was unavailable. Hurley sought review from the Appeals Council, which vacated the ALJ's decision and remanded because the ALJ had failed to seek evidence from an impartial medical advisor.

A medical advisor was retained, and he reviewed Hurley's hospital records. At a hearing on September 13, 1983, the medical advisor testified that, based upon his review of Hurley's records and the transcript of the prior hearing before the ALJ, Hurley did not need acute medical care after October 2, 1981 or skilled nursing care after October 11, 1981. However, the medical advisor described the period between October 1 and October 11, 1981 as a

"grey area" because anti-psychotic drugs were administered and restraints were used during this period to treat Hurley's episodes of agitation and confusion.

On October 31, 1983, the ALJ once again affirmed the denial of benefits on the ground that "[b]eginning October 2, 1981, the claimant did not require or receive skilled nursing care." Although the medical advisor had been wholly equivocal as to the "grey area," the ALJ interpreted his testimony as indicating that the type of restraints used on Hurley could have been provided in a custodial setting. The ALJ's discussion makes no mention, however, of the hospital's use of either Thorazine on October 1, 1981 or of Vistaril and Haldol between October 2 and October 9, 1981.

Once again, Hurley sought and was denied review in the Appeals Council. Hurley then appealed to the district court, where the Secretary moved for judgment on the pleadings. On November 2, 1987, Judge Nickerson granted the motion. The district court held that the ALJ's finding that Hurley did not need skilled care after October 1, 1981 was supported by substantial evidence. *Hurley v. Bowen*, 674 F.Supp. 421, 423–24 (E.D.N.Y.1987). This appeal followed.[2]

## DISCUSSION

Medicare normally covers both acute care rendered in a hospital and post-hospital skilled nursing services provided in a

---

1. Because the opening paragraph of Dr. Goodman's letter referred to the admission of Hurley on September 4, 1981 and the disallowance of his claim after October 1, the district court read the phrase "during this time" in the quoted sentence as referring only to Hurley's hospital stay prior to October 1, 1981. Despite Dr. Goodman's sloppy syntax, however, a reading of the third paragraph of the letter reveals that the time period referred to was that *after* October 1, 1981 and that the URC considered the only issue before it to be whether Hurley still needed *acute* care. This is how the ALJ, Hurley's counsel and the medical advisor interpret the letter, and we agree. The text of the letter states:

   This is to confirm that Mr. William Hurley of 73 Valentine Ave., Glen Cove N.Y. 11542, following his admission to The Community Hospital at Glen Cove, NY on September 4, '81 for a convulsive seizure followed by prolonged

confusion and apparent dementia was disallowed by the utilization committee on October 1, 1981.

During this time he was awaiting placement in a skilled nursing facility as it was felt he had a permanent organic brain syndrome which would require continued skilled nursing care.

Unexpectedly, while awaiting transfer to a nursing home the patient improved to the point where he was discharged to his home on October 23, '81. Since there was no way that Mr. Hurley could have left the hospital prior to his discharge, his disallowance by the committee, while technically correct, does seem most unfair to the patient.

2. Hurley died on May 9, 1986. Although we continue to refer to Hurley as the claimant, his wife is now pursuing the appeal.

skilled nursing facility ("SNF"). *See* 42 U.S.C. § 1395d(a)(1) & (a)(2)(A) (1982). While post-acute care skilled nursing services provided in a hospital are generally not covered, 42 C.F.R. § 409.10(b) (1987), Medicare does pay the costs of in-hospital skilled nursing care as long as the claimant's physician certifies that the claimant required such care and no skilled nursing facility was available. 42 C.F.R. § 405.1627(b) (1987). Medicare does not cover the cost of custodial care. 42 U.S.C. § 1395y(a)(9) (1982 & Supp. III 1985).

### 1. *Applicable Regulations*

Skilled nursing and rehabilitation services, covered pursuant to 42 U.S.C. § 1395f(a)(2)(C) (1982 & Supp. II 1984, Supp. III 1985), are defined in the regulations as services that are provided on a daily basis in a skilled nursing facility and that: "(1) [a]re ordered by a physician; (2) [r]equire the skills of technical or professional personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech pathologists or audiologists; and (3) [a]re furnished directly by, or under the supervision of, such personnel." 42 C.F.R. § 409.31(a) (1987); *see also Friedman v. Secretary of Dep't of Health and Human Serv.,* 819 F.2d 42, 45 (2d Cir.1987). A service qualifies as a "skilled service" only when it is "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a) (1987). However, "[a] condition that does not ordinarily require skilled services may require them because of special medical complications." 42 C.F.R. § 409.32(b) (1987). Furthermore, overall management and evaluation of a care plan may be considered a skilled service, and the aggregate of services provided by non-professionals may require the involvement of technical or professional personnel to evaluate and manage their provision. In such a case, the services are covered as skilled services. 42 C.F.R. § 409.33(a)(1) (1987). Observation and assessment of a patient's changing condition is also a skilled service, when it is documented that "the skills of a technical or professional person are required to identify and evaluate the patient's need for modification of treatment for additional medical procedures until his or her condition is stabilized." 42 C.F.R. § 409.33(a)(2) (1987). Specifically included among "[s]ervices that qualify as skilled nursing services" are "[i]ntravenous, intramuscular, or subcutaneous injections." 42 C.F.R. § 409.33(b)(1) (1987).

While "custodial care" is not defined in the Social Security Act, it is defined under the regulations as "any care that does not meet the requirements for coverage as posthospital SNF care as set forth in §§ 409.30 through 409.35." 42 C.F.R. § 405.310(g) (1987). Included among the "personal care services" which are usually not skilled services is "[a]dministration of routine oral medications, eye drops, and ointments." 42 C.F.R. § 409.33(d)(1) (1987).

Under the New York regulations, SNFs are called "nursing homes" and custodial care facilities are called "health-related facilities." A "nursing home patient" is a person "so incapacitated, sick, invalid, infirm, disabled, or convalescent as to require at least medical and nursing care[.] ..." N.Y.Comp.Codes R. & Regs. titl. 10, § 414.1(c)(11)(i) (1986). A "health related facility resident" is "a person, who because of social, physical, developmental or mental condition, requires institutional care and services above the level of room and board in order to secure basic services necessary to function, but who does not require the inpatient care and services provided by a hospital or skilled nursing facility." N.Y. Comp.Codes R. & Regs. titl. 10, § 414.1(c)(8) (1976). In addition, a "health related facility resident" may need "periodic or intermittent skilled nursing care and services but not continuous skilled services which in the aggregate require the direct supervision by licensed nursing personnel[ ] and [ ] requires services which can usually be delivered by non-licensed personnel and are primarily support kinds of services such as assistance with activities of daily living." N.Y.Comp.Codes R. & Regs. titl. 10, § 414.1(c)(8)(vi) & (vii) (1976).

With regard to restraints, New York regulations specifically require nursing homes to maintain written policies and procedures for their use. Such a policy must bar the use of locked restraints. It must also require that a physician authorize the use of restraints "for a specified and limited period of time, except when necessitated by an emergency, approved by the medical director, director of nursing service or in the absence of of such individual, a designated licensed nurse or administrator and applied by a licensed nurse who shall set forth in writing, as a part of the patient record, the circumstances requiring the use of such emergency restraint[.] ..." N.Y.Comp. Codes R. & Regs. titl. 10, § 416.11(b) (1984). No provision specifically governs the use of physical restraints in health-related facilities. However, minimum standards regulations applicable to health-related facilities as well as to nursing homes and hospitals impose detailed requirements on the use of restraints on "patients/residents." N.Y.Comp.Codes R. & Regs. titl. 10, § 414.20 (1984, 1986).

## 2. The Denial of Benefits

■ The Secretary's decision regarding the entitlement to benefits must be upheld if supported by substantial evidence, 42 U.S.C. § 405(g) (1982); *Friedman*, 819 F.2d at 44. While " 'more than a mere scintilla,' " "substantial evidence" is only " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed. 2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 126 (1938)); *accord Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir.1983). In determining whether the decision is supported by substantial evidence, we review the record as a whole. *See Friedman*, 819 F.2d at 44.

The issue in the instant case concerns the ALJ's finding that Hurley neither needed nor received skilled nursing care from October 2, 1981 until his discharge on October 23, 1981. In determining whether that finding is supported by substantial evidence, we are guided by two principles.

"First, the decision should be based upon a common sense, non-technical consideration of the patient's condition as a whole. Second, the Social Security Act is to be liberally construed in favor of beneficiaries." *Id.* at 45 (citations omitted). Applying these principles, we believe that the ALJ's decision was not supported by substantial evidence as to the period October 2 through October 11, 1981.

At the second hearing, the medical advisor testified that the period between October 1 and October 11, 1981 was a "grey area" on the question of custodial versus skilled care because of the hospital's use of anti-psychotic drugs and restraints in response to Hurley's episodes of agitation, confusion, and wandering. Although the pertinent regulations require consideration of the aggregate of services rendered, the ALJ ignored the administration of drugs and focused exclusively on the question of whether the use of restraints on October 2, 3, 4, 9, and 10 constituted the provision of skilled services. Also, the Secretary addresses only this issue in his brief. However, the medical advisor acknowledged that the dose of Thorazine Hurley received on October 1, 1981 was "fairly high" and that a patient who received such a dose should be monitored by a skilled observer for one or two days afterward. Moreover, Hurley was given intramuscular injections of Vistaril on October 2, and Haldol on October 4, 5 and 9. Under 42 C.F.R. § 409.33(b)(1) (1987) these intramuscular injections constituted skilled nursing services. *Cf.* 42 C.F.R. § 409.33(d)(1) (1987) (defining the administration of routine oral medications as not requiring skilled services).

We need not decide whether the use of physical restraints in Hurley's case by itself constituted skilled services. The Secretary's regulations recognize that under certain circumstances services which are not ordinarily considered skilled are covered where "in light of the patient's condition, the aggregate of those services requires the involvement of technical or professional personnel." 42 C.F.R. § 409.33(a)(1) (1987). In the instant case,

Hurley was being closely observed and monitored by professional staff. Hurley's conduct between October 2 and October 11, 1981 was a setback on his generally improving behavior, and the restraints and the injections were administered as coordinated responses to particular episodes of agitated behavior, not as part of a prescribed routine.

Under these circumstances, Hurley was one of those "[p]atients who, in addition to their physical problems, exhibit acute psychological symptoms such as depression, anxiety, or agitation," and who therefore may also require "skilled observation and assessment by technical or professional personnel to assure their safety and/or the safety of others." 42 C.F.R. § 409.33(a)(2) (1987). Our conclusion is reinforced by *Friedman*, where the claimant's medical history was factually the opposite of Hurley's. In that case, the medical advisor concluded that Friedman received only custodial care because his condition was stable, he no longer needed intravenous medications, and his treatment " 'consisted of just repeating orders at intervals as required.' " *Friedman*, 819 F.2d at 44.

We therefore conclude that the ALJ's decision denying coverage for the period October 2 through October 11, 1981 was not supported by substantial evidence. A remand is unnecessary because during that period Hurley was clearly receiving skilled nursing care which, as a practical matter, could have been provided only in an SNF. *Cf. Kuebler v. Secretary of U.S. Dep't of Health and Human Services*, 579 F.Supp. 1436, 1439–40 (E.D.N.Y.1984) (patient who wandered and suffered bouts of agitation received skilled care when restraints and psychotropic drugs used).

■ Having determined that Hurley received skilled care for the period designated, we must resolve one final issue. The ALJ's original opinion, which was subsequently vacated by the Appeals Council, included a finding that there had been no certification as to the lack of the availability of an SNF bed for Hurley after October 1, 1981. The second opinion made no mention whatsoever of this issue. However, it is uncontradicted that the hospital's Social Work Department undertook to find a bed for Hurley on October 1 and was unsuccessful. That is sufficient to establish the lack of such a bed. So far as certification of that fact is concerned, "once coverage is established, the provider of services, not the patient, is responsible for obtaining the necessary physicians' certifications, and for bearing the risk of nonpayment if such certifications are unavailable." *Friedman*, 819 F.2d at 44 (citations omitted). Accordingly, because there is no evidence that an SNF bed was available to Hurley, there is no basis for the Secretary to deny payment to him.

The order of the district court is affirmed in part and reversed in part.