**Frank LANDA, Deceased, by the Representative of the Estate, Jay LANDA, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**No. CV 91–3547.**

United States District Court, E.D. New York.

Sept. 29, 1995.

As Corrected Nov. 21, 1995.

**630**

Robert, Lerner & Robert by Charles Robert, Rockville Centre, New York, for plaintiff.

Zachary W. Carter, United States Attorney, Eastern District of New York by Daniel F. De Vita, Assistant United States Attorney, Brooklyn, New York, for defendant.

## MEMORANDUM DECISION and ORDER

SPATT, District Judge.

This action was commenced on September 13, 1991 by Jay Landa, as representative of the Estate of Frank Landa, pursuant to 42 U.S.C. § 405(g), to appeal from the denial of Medicare benefits by the Secretary of the Department of Health and Human Services, Donna Shalala (the "Secretary"). The Secretary moved the Court for an order pursuant to Fed.R.Civ.P. 12(c) granting judgment on the pleadings in her favor.

## I. BACKGROUND

Frank Landa ("Landa" or the "patient") was admitted to Memorial Hospital, Hollywood, Florida on or about December 30, 1986 and he was discharged on or about January 5, 1987. He was eighty-six at the time. The parties do not inform the Court as to the reason for Landa's hospitalization, although the records from Memorial Hospital indicate that he suffered from abdominal pain. Mr. Landa returned to his home following his hospitalization. The medical record entry on his date of discharge indicates that there were "arrangements being made for 24 hour care at home." Record on Appeal at 464 (hereinafter "R.").

On January 29, 1987, Landa was admitted to the King Street Nursing Home, which is located at 787 King Street, Port Chester, New York. An "Admitting Evaluation" form completed by Dr. Leo Morganstern, Landa's physician, notes that the patient was legally blind, partially deaf, weak and unable to walk, confused, and afflicted with organic brain syndrome. R. at 433–34. Landa's eyesight is described in the record as 'legal blindness,' 'functional blindness' and 'partial blindness.' He is also described as being 'hard of hearing,' 'wearing a hearing aide on left ear,' having 'partial deafness' and 'functional deafness.' It is apparent from these descriptions that Landa's eyesight and hearing were impaired but not totally impaired.

The nursing home admitting evaluation form also outlines a treatment plan that includes (a) cessation of the drug Haldol, using hypnotics only when needed, (b) trial use of the drug Halcion, (c) sensory stimulation twice a day with regard to Landa's partial deafness and functional blindness, (d) physical therapy for rehabilitation, (e) ambulation, (f) activities of daily living and (g) bladder rehabilitation. Dr. Morganstern also ordered that Landa receive vitamins, milk of magnesia, a Fleet Enema when necessary and Tylenol in the event of pain or elevated temperature. R. 219, 246. With regard to prescription medication, Dr. Morganstern ordered administration of the drug Halcion for January 29 through February 2, 1987 as well as Mellaril in early February and again on February 23, 1987. Apparently a psychiatric

evaluation was conducted some time during Landa's stay at King Street Nursing Home. The record reveals that Benadryl was prescribed for the period from February 12, 1987 to February 23, 1987 and Valium was prescribed for the period from February 17, 1987 to February 23, 1987.

With regard to behavior, the record reflect's notations by Landa's nurses that he was "alert" and "aware" with occasional confusion and lethargy observed prior to February 6, 1987. R. 227–28. It was first noted on February 6, 1987, that Landa was disturbing the other patients during the night and moving about his bed.

## II. PROCEDURAL HISTORY

There are discrepancies in the record regarding the date of Landa's discharge from the hospital in Florida. The parties have apparently agreed that January 5, 1987 shall be considered the date of discharge. This date is of critical importance because Medicare coverage for post-hospital extended care is dependent on the type of care that was needed or received in the thirty day period following discharge from the hospital. The record is clear regarding the date of Landa's admission to the King Street Nursing Home, which is January 29, 1987. R. 83, 184, 218–19, 227.

On that date, January 29, 1987, King Street Nursing Home advised Landa in writing that

[t]he medical information available at the time of, or prior to, admission shows that the specific services to be furnished do not meet the requirements for coverage under Medicare. However, should you request the facility to file a claim with Medicare, you will receive a formal determination from the Medicare intermediary as to the noncoverage of the stay.

R. 184–85. Despite this written advisement of noncoverage, Landa was admitted to the nursing home on January 29, 1987. Apparently a review of the nursing home's position was requested, in response to which the fiscal intermediary, Travelers Insurance Company ("Travelers") confirmed that the nursing home services were not covered by Medi-

care. The response from Travelers, dated February 11, 1987, states in part:

Extended care benefits are paid under Medicare for individuals who need on a daily basis, skilled nursing care or skilled rehabilitation services which as a practical matter can only be provided in a skilled nursing facility on an inpatient basis. Patients must require such extended care services for the medically necessary inpatient hospital care or for a condition which arose while they were in a skilled nursing facility receiving care for the same condition for which they received inpatient hospital services. Skilled care is the type of care which must be furnished by or under the supervision of skilled personnel to assure the safety of the patient and to achieve the medically desired result.

When individuals do not require such skilled services on a daily basis or when as a practical matter the provision of such services does not require that the individuals be admitted as inpatients to a skilled nursing facility, their care in a skilled nursing facility is not covered under the Medicare law. Since we have determined that the care you received was not of the type described, no Medicare hospital insurance benefits can be allowed for your skilled nursing facility stay.

R. 188. Landa's attorney requested reconsideration of the denial of benefits by Travelers and upon review, Travelers advised in a letter dated September 10, 1987, that it adhered to its prior determination that the services provided to Landa at King Street Nursing Home were not covered by Medicare. R. 193.

### A. Landa I

On September 14, 1987, Landa appealed from Travelers' denial of benefits. A hearing was held in the case, which the Court will refer to as *Landa I*, before an Administrative Law Judge (the "ALJ"), who also consulted an impartial medical advisor, Dr. Arthur Bauman, regarding the medical issues in the case. The ALJ affirmed the denial of benefits by Travelers in a decision dated December 9, 1988. The ALJ found that the care provided by the King Street Nursing Home was "custodial" in nature in that it did not

involve skilled nursing or rehabilitation services within the meaning of the Medicare law.

On appeal, the Secretary's Appeals Council vacated and remanded *Landa I* for the ALJ to determine whether (1) Landa's physician certified his need for skilled nursing facility care; (2) upon consideration of Landa's total condition, there was a need for or receipt of skilled care; and (3) if and when Landa received proper notice of noncoverage. The Appeals Council also directed the ALJ to obtain a legible copy of the psychiatric consultation report. R. 293–5.

### B. *Landa II*

The remand hearing was held by the ALJ on December 4, 1989. On April 6, 1990, the ALJ issued a decision affirming the denial of Medicare benefits, concluding that Landa's total condition established a need for custodial rather than skilled care. R. 24–26.

On April 17, 1990, Landa appealed the *Landa II* decision. The Appeals Council reversed *Landa II* and remanded the case to the ALJ to consider evidence from a medical expert and the treating physician's opinion letter, written on June 29, 1989 stating the opinion of Dr. Morganstern concerning Landa's condition and care at King Street during the period commencing on January 29, 1987. R. 426. In its opinion, the Appeals Council stated that the ALJ did consider Landa's overall condition in *Landa II*. R. 15. However, the Appeals Council directed that on remand, the ALJ was to address (1) whether the overall management and evaluation of Landa's care constituted skilled care and (2) whether Landa had any special medical complications that would require that "otherwise nonskilled services would be considered skilled." R. 15. The decision of the Appeals Council notes that extended care is covered under Medicare only if skilled care was required within thirty days after a beneficiary's hospital discharge, so that "if daily skilled services were not needed/received by February 6, 1987, and the 42 CFR 409.30(b)(2) exception [due to special medical complications] is not met, the beneficiary's subsequent skilled nursing facility stay need not be addressed."

### C. *Landa III*

On remand, the ALJ held a hearing and called the independent medical advisor Dr. Arthur Bauman to testify. R. 114–149. Dr. Bauman reviewed the opinion letter of Dr. Morganstern, the physician orders and nurse's notes as well as information relating to the medication Landa was given. He stated opinions with regard to Landa's overall condition and the level of care necessary to meet his needs. It was Dr. Bauman's conclusion, which is discussed further below, that Landa did not require or receive the type of caretaking services that can only be provided by skilled personnel. Other hospital personnel also testified at the December 17, 1990 hearing. The ALJ questioned the parties to determine whether all relevant medical information pertaining to Landa's case had been submitted for review. Upon request of the plaintiff's counsel, the ALJ directed the nursing home to submit medication records that apparently had been missing from the record.

The ALJ issued a lengthy decision dated May 7, 1991. In this decision the ALJ reviewed Landa's physical condition, his disabilities and behavior and the history of his treatment and the relevant law. R. 9–12. The ALJ concluded in this, the *Landa III* decision, that Landa did not qualify for Medicare coverage for the services provided by the King Street Nursing Home during the period beginning on January 29, 1987 through the 100th day of his stay at the facility.

On June 4, 1991, Landa appealed from the ALJ's *Landa III* decision, arguing that the ALJ applied an incorrect legal standard in weight assigned to the medical evidence in the case. The Secretary's Appeals Council denied review of *Landa III* on July 11, 1991, citing two recent Second Circuit cases in which that court "declined to specify the weight to be assigned any particular opinion evidence on Medicare cases," namely *Stein v. Secretary of HHS*, 924 F.2d 431 (2d Cir.1991) and *Holland v. Sullivan*, 927 F.2d 57 (2d Cir.1991). R. at 2. When the Appeal's Council denied review, *Landa III* became the final determination of the Secretary.

Landa then commenced this action, pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Secretary's final decision, *Landa III*. The Secretary moved the Court for judgment on the pleadings in its favor. Landa opposes the motion on the ground that (1) the Secretary failed to assess the "total needs" of Landa and therefore incorrectly applied the substantial evidence test and (2) that the Secretary's decision reflects a general policy of "nonacquiescence" with Second Circuit holdings.

### III. DISCUSSION

#### A. Standard of Review

 A final decision by the Secretary of Health and Human Services as to Medicare coverage is conclusive if it is supported by substantial evidence. *Friedman v. Secretary of Health & Human Serv.*, 819 F.2d 42, 44 (2d Cir.1987). This means that the Secretary's findings will be upheld if the supporting evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). In assessing whether substantial evidence supports a decision by the Secretary the Court is to review the record as whole, looking at the evidence supporting the Secretary's position as well as other evidence that detracts from it. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir.1990). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Id.* (citing *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir.1988).

With regard to the specific issues raised in this case, the Second Circuit stated:

A determination of a Medicare claimant's need for skilled nursing care as opposed to custodial care should be guided by two principles. First the decision should be based upon a common sense non-technical consideration of the patient's condition as a whole. *E.g., Gartmann*, 633 F.Supp. at 679; *Howard v. Heckler*, 618 F.Supp. 1333

(E.D.N.Y.1985). Second, the Social Security Act is to be liberally construed in favor of beneficiaries. *E.g., Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir.1983); *See also Ridgely v. Secretary*, 345 F.Supp. 983, 993 (D.Md.1972) ("the purpose of the custodial care disqualification ... was not to disentitle old, chronically ill and basically helpless, bewildered and confused people ... from the broad remedy which Congress intended to provide for our senior citizens"), *aff'd*, 475 F.2d 1222 (4th Cir. 1973). A claimant nevertheless has the burden of proving entitlement to Medicare benefits. *Morton v. Heckler*, 586 F.Supp. 110, 111 (W.D.N.Y.1984); *Rendzio v. Secretary*, 403 F.Supp. 917, 918 (E.D.Mich. 1975).

*Friedman*, 819 F.2d at 45. It is within this framework that the Court will review the Secretary's denial of Medicare benefits to Frank Landa.

#### B. The Statutes and Regulations

In enacting Medicare, 42 U.S.C. §§ 1395–1395ccc, Congress established a federally funded health insurance benefit system for the aged and disabled. At issue in this action are the provisions of Medicare that extend coverage, under certain circumstances, for post-hospital extended care services. Section 1395d(d)(2)(A) provides that expenses for post hospital extended care services may be covered for up to 100 days. Extended care services consist of services provided to an inpatient of a skilled nursing facility by such a facility and include, among other things, nursing care by or under the supervision of a registered professional nurse, physical or occupational therapy and bed and board as well as drugs and supplies furnished for the care and treatment of inpatients. 42 U.S.C. § 1395x(h).

 The regulations promulgated pursuant to Medicare define skilled nursing or skilled rehabilitative care services as those that

(1) Are ordered by a physician;

(2) Require the skills of technical or professional personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational thera-

pists, and speech pathologists or audiologists; and

(3) Are furnished directly by, or under the supervision of, such personnel.

42 C.F.R. § 409.31. In addition, such services must be needed by the patient on daily basis and "must be ones that, as a practical matter, can only be provided in a SNF [skilled nursing facility], on an inpatient basis." *Id.* A service that is ordinarily considered nonskilled may be considered skilled if it must be performed or supervised by skilled personnel due to a patient's special medical complications. 42 C.F.R. § 409.32. In some instances, the "overall management and evaluation" of a plan of care may constitute skilled nursing or rehabilitation services covered by Medicare because the patient's physical or mental condition is such that the involvement of technical or professional personnel is needed to meet the patient's needs, promote his or her recovery and ensure medical safety. 42 C.F.R. § 409.33(a)(1). Similarly, if the skills of a professional are needed to "identify and evaluate the need for modification or treatment for additional medical procedures until his or her condition is stabilized," the observation and assessment of the patient's changing condition may constitute skilled services that are covered by Medicare. 42 C.F.R. § 409.33(a)(2). "The[se] regulations recognize that a patient's total health care picture must be considered when determining whether the care at issue qualifies for Medicare coverage." *Aurora v. Secretary of Health and Human Services,* 715 F.Supp. 466 (E.D.N.Y.1989), *aff'd,* 896 F.2d 543 (2d Cir.1990).

The list of services that qualify as skilled nursing services includes the following (1) intravenous or intramuscular injections or intravenous feeding; (2) tube and gastrotomy feeding; (3) aspiration; (4) insertion and replacement of catheters; (5) application of dressings; (6) treatment of widespread skin disorders; (7) physician ordered heat treatments; (8) administration of medical gases; (9) rehabilitation such as bowel and bladder training programs. 42 C.F.R. § 409.33(b).

Medicare expressly excludes coverage for "custodial services." 42 U.S.C. § 1395y(a)(9). "Observing that 'custodial

care' is not defined by statute the courts have consistently interpreted the term in light of the statute's benevolent congressional purpose using a nontechnical approach, common sense meaning, and consideration of the needs and underlying condition of the claimant insured as a whole." *Kuebler v. Secretary of Health and Human Services,* 579 F.Supp. 1436 (E.D.N.Y.1984) (citing *Klofta v. Mathews,* 418 F.Supp. 1139, 1142–43 (E.D.Wis.1976); *Samuels v. Weinberger,* 379 F.Supp. 120, 123 (S.D.Ohio 1973); *Breeden v. Weinberger,* 377 F.Supp. 734, 737 (M.D.La. 1974); *Schoultz v. Weinberger,* 375 F.Supp. 929, 932 (E.D.Wis.1974); *Ridgely v. Secretary of Health, Education and Welfare,* 345 F.Supp. 983, 990 (D.Md.1972), *aff'd,* 475 F.2d 1222 (4th Cir.1973); *Reading v. Richardson,* 339 F.Supp. 295, 300 (E.D.Mo.1972); *Sowell v. Richardson,* 319 F.Supp. 689, 691 (D.S.C. 1970)). While not defining "custodial services," the regulations do set forth a nonexhaustive list of "personal care services," which includes the following: administration of oral medication; bathing and treatment of minor skin problems; assistance in dressing, eating and going to the toilet; and general supervision of previously taught exercises and assistance with walking. 42 C.F.R. § 409.33(d). These personal care services are not considered to be skilled services in the absence of special medical complications or the need for overall plan management and evaluation or observation and assessment of a changing condition. *See* 42 C.F.R. §§ 409.32 & 409.33.

### C. The Relevant Time Period

As discussed above, the critical time in this case is the thirty day period following Landa's discharge from the hospital. *See* 42 C.F.R. 409.30(b) (providing that to qualify for extended care coverage, the patient must have needed and received skilled care within 30 calendar days after the date of discharge from the hospital). Although the dates of January 5, 1987 and January 8, 1987 both appear in the record as the date of Landa's discharge from the hospital in Florida, the parties agreed on the record at the December 17, 1990 hearing before Administrative Law Judge John W. Whittlesey, that the date

of discharge was January 5, 1987. R. 102. As the plaintiff's counsel explained, "the nine day period [between Landa's admission on January 29, 1987 and February 6, 1987] is an anchor to the full 100 days." R. 87. Therefore, the Court will review the facts relating to Mr. Landa's needs and overall condition between the dates of January 5, 1987 and February 6, 1987 to determine whether the care provided to him is properly classified as skilled nursing or rehabilitative care in that the services of a skilled professional were required either to administer or monitor the administration of the care.

### D. The Legal Standard Applied by the Secretary

■ The Court will first address the plaintiff's argument that the Secretary applied an improper legal standard in assessing the evidence in this case. Landa contends that the Secretary's denial of benefits is based on a technical analysis of the services rendered to determine if those services were "skilled" within the meaning of Medicare. Landa contends that this standard is erroneous in that it fails to consider and adequately evaluate the patient's total condition. The Court disagrees. In the Court's view the Secretary's final decision was not based on an erroneous interpretation of the law.

In particular, the Court notes that the Appeals Council remanded *Landa I* with express instructions to consider Landa's overall condition, stating that

> [p]ursuant to 42 CFR 409.30(b), skilled care must have been needed and received within 30 days after the beneficiary's hospital discharge (i.e., from January 8, 1987 through February 6, 1987). Thus, if daily skilled services were not needed/received by February 6, 1987, the beneficiary's subsequent skilled nursing facility stay need not be evaluated. *In evaluating the need for and receipt of skilled care, however, the beneficiary's total condition must be considered.* Although the decision evaluates observation/assessment (42 CFR 409.33(a)(2)) that the beneficiary received (page 2, paragraph 4), it does not specifically address whether the overall management and evaluation of the beneficiary's care plan constituted skilled care (42 CFR 409.33(a)(2)). *The decision also does not specifically address the beneficiary's total condition.*

R. 294–95 (emphasis supplied). When the Appeals Council reviewed the April 6, 1990 *Landa II* decision, it noted that the ALJ did "address the beneficiary's overall condition." R. 15. However, the Appeals Council found that remand of *Landa II* was necessary to address, among other things, (1) whether the overall management and evaluation of Landa's case constituted skilled care and (2) whether Landa had any special medical conditions that would require that otherwise unskilled services would be considered skilled. The ALJ was also directed to obtain additional medical evidence, namely the treating physician's certification and the utilization review committee decision, as well as the opinion of a medical expert. R. 16. When the Appeals Council denied review of *Landa III*, which addressed the issues previously identified by the Appeals Council, it became the Secretary's final determination.

Based on the foregoing, it is the Court's view that the legal standard applied by the Secretary in reviewing Landa's claim did not depart from the legal standard endorsed by the Second Circuit, namely a "common sense, nontechnical consideration of the patient as a whole." *See e.g., Hurley v. Bowen,* 857 F.2d 907, 912 (2d Cir.1988); *Friedman v. Secretary of Health and Human Services,* 819 F.2d 42, 45 (2d Cir.1987). The nature of the services provided are necessarily part of an overall evaluation of a patient's total condition and total treatment. Based on a review of the entire record in this case, the Court cannot say that the Secretary focused on the services provided to Landa rather than on Landa's aggregate needs in denying his medical claims.

■ Landa also contends that the Secretary erred in not giving determinative weight to the opinion of Dr. Morganstern, Landa's treating physician, who stated that Landa was in need of skilled nursing care. It was not a legal error by the Secretary to weigh Dr. Morganstern's opinion with all the other evidence. The Second Circuit has expressly refrained from imposing a rule regarding the

weight that should be attributed to the opinion of the treating physician in determining Medicare coverage. Concerning this issue, the court stated:

> We are not prepared at this time to pass judgment upon the district court's holding that the case can be disposed of by applying the treating physician rule that is used in social security disability cases.... We believe it better practice to have the Secretary first advise us what role if any the attending physician rule played in the instant case and will play in future cases of this nature.

*Stein v. Secretary of Health and Human Services,* 924 F.2d 431, 433–34 (2d Cir.1991). The Second Circuit restated this position in the following manner:

> Finally, we will also follow *Stein* in leaving for the Secretary's initial consideration the issue of whether the treating physician rule, applicable to disability cases, *see Schisler v. Bowen,* 851 F.2d 43 (2d Cir. 1988), applies to Medicare coverage determination. Though the considerations bearing on the weight to be accorded a treating physician's opinion are not necessarily identical in the disability and Medicare contexts, we would expect the Secretary to place significant reliance on the informed opinion of a treating physician and either to apply the treating physician rule, with its component of "some extra weight" to be accorded to that opinion, *id.* at 47, or to supply a reasoned basis, in conformity with statutory purposes, for declining to do so.

*Holland v. Sullivan,* 927 F.2d 57, 60 (2d Cir.1991). In the present case, the Secretary did not give determinative weight to the opinion of Dr. Morganstern, Landa's attending physician. However, the Secretary did set forth the reasons supporting that decision. In *Landa III,* which is the Secretary's final decision, the ALJ stated:

> Moreover, even assuming *arguendo* without deciding that *Schisler* [assigning determinative or great weight to the treating physician's opinion] applies, such a rule would clearly not warrant a decision in favor of claimant in this matter. Dr. Morganstern, in a letter to claimant's attorney, dated June 29, 1989 (Exhibit B–9) states that he found the claimant to need extensive nursing care of a "skilled nursing variety." However, the doctor does not support his statement or explain his reasons for concluding the claimant needed extensive, or indeed any, skilled nursing care. As such, his statement is merely an unsubstantiated conclusion.

R. 10. The Court agrees that Dr. Morganstern's statements regarding Landa's needs were conclusory. Dr. Morganstern does not indicate that Landa's condition was unstable and in need of ongoing monitoring and modification, nor does he document medical complications requiring the attention of trained medical personnel. Further, Dr. Morganstern's opinion was not set forth contemporaneously with the doctor's care and observation of Landa. His letter was written on June 29, 1989, more than two years after the time he cared for Landa at the King Street Nursing Home. While the doctor twice stated the conclusion in that letter that his patient required skilled nursing care, he also noted that "I saw no purpose in admitting him to the hospital for several days prior to obtaining a nursing home inasmuch as we had multiple family members to give the immediate necessary attention." R. 426–27. Dr. Morganstern's letter relates that Landa suffered from multiple disabling conditions, such as Alzheimer's Disease, partial blindness and partial deafness, but does not set forth any medical ailments or injuries that would have required special medical attention. Disorientation and uncooperative behavior are also noted by Dr. Morganstern as necessitating physical and chemical restraints and a psychiatric consultation.

Similarly, the January 29, 1987 Nursing Home Admitting Evaluation, which is a contemporaneous evaluation of Landa by Dr. Morganstern, lists the disabling conditions of partial blindness, partial deafness and organic brain syndrome as well as confusion, weakness and an inability to walk. Dr. Morganstern's treatment plan at the time of Landa's admission to King Street Nursing Home consisted of (1) cessation of the drug Haldol; (2) hypnotics as needed including a trial of the drug Halcion; (3) sensory stimulation for

partial blindness, functional deafness, ambulation and the activities of daily living; (4) physical therapy for rehabilitation; and (5) bladder rehabilitation. The record indicates that after Landa's admission to King Street Nursing Home, he was not seen again by Dr. Morganstern for four days. R. 228. The initial evaluation by Dr. Morganstern does not describe conditions or order the type of monitoring of Landa's condition that is associated with "skilled care." The facts relating to Landa's condition do not necessarily lead to the conclusion stated by Dr. Morganstern in 1989, that skilled care was required.

### E. The Care Provided In Response To Landa's Overall Needs

■ During the critical time period between January 29, 1987 and February 6, 1987, Landa's condition required that he receive, and he did receive the following: medication, periodic imposition of physical restraints and assistance with personal care and the daily activities of living. The Court will review the condition that gave rise to the need for this care and the nature of the services that were given in response to those needs.

#### i. medication

Apparently prior to admission, Landa had been given Haldol, which is described as a medicine for use in the management of manifestations of psychotic disorders. *See* Physicians' Desk Reference 1357 (48th ed. 1994) (hereinafter "PDR"). Dr. Morganstern's January 29, 1987 Admitting Evaluation form indicates that question existed about drug sensitivity for the use of Haldol by Landa. One of the express provisions of Dr. Morganstern's treatment plan was "off all Haldol." *See* R. 434. Indeed, the medication records do not indicate that any Haldol was administered to him during the period in question.

The treatment plan indicates that there shall be a "trial of Halcion." R. 434. The use of Halcion is indicated for short term treatment of insomnia. PDR 2422. It appears from the "Individual Patient's Narcotics Record" that Landa was given 25 mg of Halcion orally at bedtime until it was discontinued on February 2, 1987 on which date the Nurse's Notes indicate that Landa was observed to be "extremely lethargic." R. 228, 244.

It appears from the physician's orders that Mellaril, to be taken orally, was prescribed for Landa "for agitation" on February 2, 1987 when the administration of Halcion was discontinued. R. 246. The Physician's Desk Reference states that the use of Mellaril is indicated for treatment of "multiple symptoms such as agitation, anxiety, depressed mood, tension sleep disturbances, and fears in geriatric patients." PDR 2058. It is also evident from the Physician's Orders that the dosage of Mellaril was changed from 10 mg to 20 mg, although the date of that change is not legible in the record. R. 220.

Landa was also given therapeutic vitamins, acetaminophen for back pain and Fleet enemas for constipation during this period. These are nonprescription items. The drugs Valium and Benadryl became part of Landa's treatment plan after February 6, 1987.

Landa argues vigorously to this Court that the comments of Dr. Bauman, who gave his medical opinion at the request of the ALJ at *Landa I* and *Landa II* reveal that the administration and monitoring of drugs like Haldol, Valium and Mellaril involve skilled nursing care. Dr. Bauman stated that such drugs must be dispensed with great care and that misjudgment in administration of the drugs "can have devastating effects." R. 122. The Court does not find this statement to be at odds with Dr. Bauman's later response to this question by Landa's attorney: "And what type of person and what kind of skill would be necessary to medicate a blind, deaf person who's taking psychotropic drugs that could kill him?" Dr. Bauman replied, "A person who was instructed and knew how to read and give the medications that the doctors ordered." R. 127. Taken as a whole and in context, Dr. Bauman's opinion is that special care and judgment must be exercised when prescribing these drugs, but that no specialized skill is required to follow a doctor's orders regarding the amount of the medication to be given and the intervals at which to give it.

The Court notes that all of the medication given to Landa was by oral dosage in contrast to intramuscular or intravenous injections. Medication by injection is one of the indicia of skilled care noted in the Medicare regulations. *See* 42 C.F.R. 409.33(b). The Court disagrees with the Secretary's conclusion that "the oral medications prescribed by the attending physician could have been self-administered." R. 10. However, the issue in this case is not whether Landa could care for himself, but rather what level of care was would meet his needs. There is no question that a person with Landa's major difficulties would not be able to manage his own care without assistance, nor would he be able to follow prescription drug directions independently. Rather, the question for the Court is whether Landa's overall condition gave rise to the need for skilled nursing care services within the meaning of the Medicare.

In addition, the observations set forth in the Nurse's Notes for the period in question could be made by a lay person rather than trained medical personnel. For example, (a) the entry for January 30, 1987 indicates that Landa had a "quiet night" and was "still adjusting to new environment;" (b) on January 31, 1987 another "quiet night" was observed and the patient was described as "alert and confused" and "still adjusting;" (c) on February 2nd, it was noted that Landa was "extremely lethargic;" (d) the next entry on February 6, 1987 indicates that Landa was awake until 2 a.m., disturbing the other patients, restless and trying to get out of bed and needed physical restraints to restrict his mobility. R. 228–29. With regard to medication specifically, as well as Landa's overall condition generally, it appears that the observations that were required and noted were no more involved or technical than routine monitoring for adverse reactions or beneficial results.

Landa's medication did change during the period in question, once from Halcion to Mellaril and once from 10 mg to 20 mg of Mellaril. However, neither Dr. Morganstern's instructions, nor the notes in the record by the nurses reveal that there was more than the usual need to be aware of adverse reactions or beneficial responses to the oral medications, which can be made by persons other than trained medical personnel. There is no evidence in the physician's orders or the nurse's notes that there was constant monitoring or modification of Landa's medication.

### ii. physical activity

Although Dr. Morganstern's Admitting Evaluation treatment plan noted "physical therapy for rehabilitation," the record does not reveal that a course a physical therapy was conducted for Landa beyond periodic assisted walks with the floor staff. The Nurse's Notes do indicate that Landa was "ambulated." The Court does not observe any activity in the record that would be characterized as skilled rehabilitation services, such as therapeutic exercises, gait evaluation and training, range of motion exercises or tests and measurements of physical abilities. *See 42 C.F.R.* § 409.33(c). Apparently, Landa was not considered to be a candidate for rehabilitation. In any event, he was not treated in that manner.

### iii. personal care and activities of daily living

In the Court's view, the fact that Landa required assistance with eating, walking and going to the toilet does not necessarily lead to the conclusion that Landa needed daily skilled services that could only as a practical matter be provided in a skilled nursing facility by skilled personnel, even when considered in light of the serious conditions discussed above. It is noted that Landa's care with regard to eating, toileting, hygiene, ambulation and even physical restraints is reported in "Nursing Aides' Patient Care Record." This type of assistance simply does not require the skills of technical or professional personnel in an inpatient facility. A nurse's aide or a home companion can, with reasonable certainty, perform such duties. There is substantial evidence that all of these services can be afforded by a semi-skilled attendant or companion in a home custodial situation. This type of care is expressly excluded from coverage in the absence of special circumstances by the Medicare regulations.

### F. A Review of the Precedents

Landa's case resembles those Medicare benefit cases where the court found that the patient's overall condition indicated a need for custodial rather than skilled care. For example, following hospitalization for pain and swelling in the knee and hemarthrosis, the patient in *Aurora, supra,* who had arthritis, an enlarged heart and arteriosclerotic heart disease, was given physical therapy twice a week, anti-inflammatory medication as well as medication for anxiety and pain. *Aurora, supra,* 715 F.Supp. 466. She was assisted with bathing, eating, and ambulation and she was incontinent. The *Aurora* court found that most of the services provided to the patient were custodial in nature, such as the administration of oral medication on a routine basis and assistance with daily living tasks. *Id.* Even a consideration of the patient's overall condition, which included serious heart ailments, did not change the court's conclusion. *Id.* at 469.

Similarly, it was the Second Circuit's view that the patient in *Friedman, supra,* required care that was custodial in nature, rather than skilled care. *Friedman, supra,* 819 F.2d at 42. Mr. Friedman, who entered a nursing home after a fall left him with a "probable skull fracture with subdural hematoma," also suffered from Parkinson's disease and phlebitis. A course of medication that was commenced at the hospital including Dyazide, Haldol and Tylenol was continued at the nursing home. Supporting the Secretary's denial of benefits were the facts that Friedman's medication was not given intravenously and that administration of the medication consisted of carrying out orders at intervals. *Id.* at 44. Despite Friedman's prior serious head injury, his disabling diseases and the psychotropic medications he required, the court upheld the Secretary's determination that his "overall condition and needs were such that he was not receiving and did not need skilled nursing services."

There is another similarity between *Friedman* and this case. In *Friedman,* the court stated that patient's position was most strongly supported by the fact that two "scoring" forms, in which physicians rate a patient's condition in various categories, concluded that Friedman needed skilled nursing facility care. *Id.* at 46. The *Friedman* court noted that "the details in these forms do not necessarily support this conclusion." *Id.* The same is true of Landa's case. Two Utilization Review Forms, in which an independent physician enters information about a patient, indicate that Landa is in a "physical C" "resource utilization group." R. 440, 444. "Based on New York State criteria," the level of care indicated is "skilled nursing facility." *Id.* However, in response to "enter whether the patient should be medically qualified for SNF Medicare Coverage" the form indicates that Landa is "not eligible for Medicare coverage and/or does not fulfill the Medicare eligibility requirements for SNF level of care." *Id.* No comments or explanations are set forth in space provided on this form.

The Court notes that in the December 17, 1990 hearing in *Landa III,* Ms. Shea, the Director of Nursing at King Street Nursing Home, testified that pursuant to the New York State classification system "physical C" category patients must go to a skilled nursing facility. R. 105–06. Only patients who are able to function independently and are in the "PA" or "PB" categories, those who are able to walk unassisted and take their meals in a dining room, can be patients at "health related care facilities." *Id.* Ms. Shea testified that all "physical C" patients must go to "skilled nursing facilities" whether or not they require skilled nursing or rehabilitation services. *Id.* Like the forms in *Friedman,* the details of Landa's URCs, do not necessarily support the conclusion that skilled nursing services were needed and provided. This is the case even though Landa's proper placement under New York State criteria was a skilled nursing facility.

When the choice to admit Landa to King Street Nursing Home was made, he was advised in writing that the services provided to him would not be covered by Medicare, despite the fact that he was entering a skilled nursing facility. R. 184. Admission to a skilled nursing facility does not necessarily mean that skilled services are needed by the patient or will be provided to the patient. In other words, both custodial care

and skilled care may be provided by personnel at skilled nursing facilities.

Landa's overall condition differs in its severity and complexity with cases in which the patient's overall condition dictated the need for skilled nursing services within the meaning of the Medicare law. For example, in *Hurley, supra,* there was testimony that the patient received fairly high dosages of Thorazine as well as intramuscular injection of Haldol and Visaril, so that close monitoring of the patient's condition by skilled observers was required for one to two days. *Hurley, supra,* 857 F.2d 907. In *Hurley* physical "restraints and injections were administered as coordinated responses to particular episodes of agitated behavior, not part of a prescribed routine." *Id.* at 912–13. This differs from Landa's case where oral medication was administered at routine intervals set by the prescribing physician.

In *Gartmann, supra,* the court determined that skilled nursing services were required to care for a patient who was partially paralyzed, aphasic, totally unable to communicate, incontinent, and suffered from congestive heart failure, atrial fibrillation, pulmonary infiltrate and a urinary tract infection. *Gartmann, supra,* 633 F.Supp. 671. Mrs. Gartmann also needed total and complete assistance with her personal care. *Id.* Viewing the patient's overall condition, the district court reversed the Secretary's determination that the services rendered were merely supportive and custodial, not requiring the presence of a skilled personnel. *Id.* at 678. Landa's difficulties, although considerable, are not as severe or complicated as Mrs. Gartmann's, who had an infection, heart and lung disorders, was incontinent and had no ability to communicate.

Nor does Landa resemble Mrs. Kuebler, whose unstable condition gave rise to a need for daily observation and modification of dosage of Haldol, Darvacet and Dalmane. *See Kuebler, supra,* 579 F.Supp. 1436. On admission to a nursing home following hospitalization for a fracture, Mrs. Kuebler was diagnosed with kyphoses, osteoporosis, back pain and possible fracture of a vertebra, progressive cerebral arteriosclerosis with brain atrophy, a urinary tract infection, Parkinson's disease and chronic depressive reaction by history. *Id.* at 1437. Based on this patient's extreme needs, Judge Wexler held that the care she required and received was not custodial in nature and therefore was covered by Medicare. While it is clear to the Court from the record that Frank Landa needed care and assistance, he required a different type of care than these patients who clearly needed the attention that only skilled professionals could provide.

## IV. CONCLUSION

Most of the services that were provided to Landa at King Street Nursing Home are not categorized as skilled services by Medicare. Consideration of Landa's overall serious condition does not change this conclusion. The record reveals that Landa was treated with oral medication given to him at set intervals and that he required no intramuscular or intravenous medication. Although his sight and hearing were impaired, he was observed to be awake, alert and continent during the time period in question, with only periodic confusion and lethargy. Further, Landa did not require wound care or catheterization, nor did he have any special medical complications that required medical treatment or skilled nursing care.

The Court has considered the record as a whole and weighed the evidence that detracts from the Secretary's position, as well as the evidence that supports it. On the totality of the circumstances, the Court finds that substantial evidence supports the Secretary's decision and the Court affirms the Secretary's decision denying Medicare coverage. Judgment on the pleadings dismissing the complaint, is granted.

The Clerk of the Court is advised that this Order closes the case.

**SO ORDERED.**